IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:09-CR-482-5  (TWT)(LTW) |
| | ) | |
| IVEY GRANT | ) | |
| _____ | ) | |

## POST-HEARING BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS WIRETAP EVIDENCE

COMES NOW IVEY GRANT, by and through the undersigned attorney, following *Franks* hearings before this Honorable Court on December 17, 2010, and January 6, 2011, and submits the following in further support of his motion to suppress wiretap evidence, (Doc. 130).

## I)  STATEMENT OF FACTS.

### *Leon Lumsden.*

On April 19, 2006, in the Northern District of Georgia, case number 1:05-CR-316, the United States indicted LEON LUMSDEN for numerous counts of bank fraud, wire fraud, money laundering and aggravated identity theft. The indictment charged Lumsden with making numerous sworn false statements on mortgage loan applications and at closings. The **FBI** arrested Mr. Lumsden on

April 26, 2006. *(See* 1:05 CR 316, Doc. 142).  Upon promises to cooperate with

the government, Mr. Lumsden, a citizen of Jamaica, was released on a $25,000

bond. (Doc. 220, "EXHIBIT M.")

On August 16, 2007, the FBI re-arrested Mr. Lumsden for committing new

loan frauds.  (Doc. 220,"EXHIBIT N.") This time, Mr. Lumsden was held without

bond and his previous bond revoked.  (Doc. 220, "EXHIBIT O & P").  Lumsden

has remained in custody ever since August 16, 2007.  The government filed a

separate indictment against Lumsden, case number 1:07-CR-312.  (Doc. 220,

"EXHIBIT Q.")  The prosecutor in both of Lumsden's federal fraud cases was

**AUSA GALE MCKENZIE**. (Doc. 220, "EXHIBIT R.")

### *ATF Interviews by Peter Beck.*

In February of 2008, ATF Agent PETER BECK interviewed Leon

Lumsden.  Lumsden was attempting to reduce his future federal sentences.  At this

interview,  Lumsden provided Agent Beck with information about a drug

trafficking operation based in Miami, and information about the 30 Deep Gang

and connection to "The Game Room," a business in DeKalb County.  (Doc.261[1]-

5).  Agent Beck was interested in the 30 Deep / Game Room information, however

he was not investigating interstate drug rings at the time.  Thus, Agent Beck

---

[1]Doc. 261 is the transcript of the second / continued  Franks hearing held on January 6, 2011.

suggested that Lumsden's attorney, DAVID MACKUSICK, "farm out this information" to another agency such as DEA or HIDTA.  Agent Beck interviewed Lumsden on two separate occasions.  (Doc. 261-5).

During the first interview, Agent Beck learned that Lumsden knew another ACDC[2] inmate named MARCUS WATKINS, and the two men were discussing Watkins' cooperation.  (Doc.261-7).  This shocked Agent Beck as he wondered "who Watkins had talked to besides Lumsden and how many other inmates, or who else knew what was going on, or may know what kind of investigations we may initiate based on that info." (Doc. 261-7).

ATF, like other federal law enforcement agencies including the FBI, maintains a searchable database of suspects, targets and people of interest.  When an agent files a report, he or she is able to flag or highlight names so an analyst or supervisor can upload the subject's name into the database.   If uploaded, a latter search for the name will allow the searcher to discover the earlier reports.  If a suspect's name is not uploaded, it cannot be retrieved or discovered in a latter search.  (Doc.261-19; Doc.262[3]-17,18,115).

At the *Franks* hearing, Agent Beck, *sua sponte*,  re-took the stand and

---

[2]Atlanta Pretrial detention Center.

[3]Doc. 262 is the transcript of the first day of the Franks hearing held December 17, 2010.

3

testified that he was not actually sure about this matter:

> AGENT BECK: I've been asked about entering Leon Lumsden's name in N-Force and I thought I probably should have and then I'm realizing in my reporting, because this is confidential information and because I thought I may be actually documenting him as an informant, I did not refer to him by name in the 30 Deep investigations and because of that I probably did not put him in as a person that could be indexed or searched in our N-Force database.

(Doc.261-28,29).

Although Agent Beck may have failed to enter Lumsden in the ATF data-base, the FBI had previously indexed Mr. Lumsden as being a twice charged mortgage "fraud-ster." [Doc.262-18,19].

### ***The March 2, 2008 letter from Lumsden***.

In March of 2008, Leon Lumsden mailed copies of a typed letter to the FBI, DEA and the HIDTA Task Force.  (Gov. Ex 2, admitted at Doc. 262-14).  In this letter, Lumsden professed to have "some very vital and detailed information concerning a major multi-million dollar drug operation" in Atlanta, the head of this operation being MARLON BURTON.  Lumsden promised, "the information I have is new and current information that will lead to many arrests."  The last lines of this letter read as follows:  "I ask now that all parties interested in my providing this information please contact my attorney and the U.S. Attorney assigned to my

case to set up a debriefing at the Federal courthouse here in Atlanta as soon as possible." . . . . "**The U.S. Attorney is Gale McKenzie**." (Gov. Exhibit 2).

When it received this letter on March 14, 2008, the Atlanta FBI office did not have an open investigation on Marlon Burton. Thus, the FBI placed the letter into a general control file, in case it became useful at later date. (Doc. 262-13).

### *The FBI's Investigation of Marlon Burton.*

In the summer of 2008, the FBI in Brownsville, Texas, began investigating Marlon Burton. In July of 2008, Brownsville agents asked for help from the Atlanta FBI office with the investigation of Burton. In September of 2008, a Texas FBI agent re-discovered the March 2008 letter from Leon Lumsden. (Doc. 262-10-12). Given Lumsden's claims of knowledge about the intimate details of the Marlon Burton drug trafficking organization, the FBI agents in Atlanta decided to interview him. (Doc.262-21).[4]

### *Meanwhile in Atlanta - Lumsden gets a 5K and is sentenced.*

On July 28, 2008, the Honorable Beverly Martin sentenced Mr. Lumsden to serve 135 months on 1:05-CR-316, and 120 months on 1:07-CR-312, running concurrently. Judge Martin also ordered that Lumsden be turned over to

---

[4] Prior to 2008, other agencies had investigated Marlon Burton and his DTO. DEA had investigated him. Burton "had been looked at several times." (Doc. 262-25) In fact, DEA interviewed Leon Lumsden about Burton before the FBI did in October 2008. (Doc. 262-103).

immigration authorities upon the completion of his sentence.  To get his sentence reduced  down to 135 months, Mr. Lumsden provided the government with what was deemed to be substantial assistance in the investigation and prosecution of others.  The prosecutor, AUSA GALE MCKENZIE, filed motions for sentence reduction pursuant to U. S. Sentence Guideline § 5K1.1.  (*See* 1:05-CR-316 Doc.s 744-753; 1:07-CR-312 Doc. 80); (Doc. 219, EXHIBIT G).

### *The Information-For-Sale Scheme*.

In August of 2008, federal prosecutors in the Northern District of Georgia learned of a scheme being carried out in the Atlanta Pretrial Detention Center by MARCUS WATKINS.  WATKINS was brokering and selling information to fellow inmates so they might obtain § 5K1.1 sentence reductions based upon third-party information which they purchased, but did not actually know to be true.  On August 21, 2008, AUSA TODD ALLEY received numerous letters written by MARCUS WATKINS addressed to LEON LUMSDEN and others.  Many of the letters were demands for payment to WATKINS for information he had previously provided or brokered for LUMSDEN.

On August 21, 2008, AUSA ROBERT MCBURNEY, who had learned of the scheme from his fellow AUSA, sent an E-mail to ATF agent DAVID ROBINSON

and AUSA ANGELA JORDAN which included the following concerns:   "Dave:
Are you still angling for a T-III[5] that would rely in any way on info from Marcus
Watkins, an ACDC inmate you debriefed?  If so, we need to chat. - Robert."   On
August 23, 2008, AUSA Jordan forwarded AUSA McBurney's E-mail to FBI
agent MILE BROSAS and other AUSA's.  AUSA Jordan relayed AUSA's
McBurney's concern: "[I]f the information Marcus provided is being relied upon
in any investigations, that the agent(s) relying on the information speak with Mile
and Robert."  (Doc. 219, "EXHIBIT B.")

On August 26, 2008, FBI Agent BROSAS, S/A A. BRETT FEARS, and
Assistant United States Attorney MCBURNEY confronted WATKINS with copies
of letters he had written to other inmates at the Atlanta Pretrial Detention Center.
The letters provided incriminating details about WATKINS' operation to sell
information to inmates so they might earn 5K1.1 sentence reductions.   Agent
Brosas noted:   "CHS (confidential human source) [WATKINS] has also known
LEON LUMPSTON, (sic.), aka "SHARKY" for a long time.  CHS introduced
LUMPSTON to CHS' cousin, KATRINA LSHAWN MCCURTY, who is a good
source of information regarding local, Atlanta crimes . . . . "MCCURTY has given

---

[5]Title III wiretap warrant.

information about various crimes to LUMPSTON, who has provided the
information to the UNITED STATES ATTORNEY'S OFFICE for purposes of
cooperation."  . . . .  "CHS has acted as a broker for MCCURTY, by providing
her information to both LUMPSTON and HUNTER in exchange for money.
LUMPSTON pays MCCURTY for her information by allowing her access to his
commissary account, or by transferring money to CHS' account."  . . . .  "In April
and May 2008, as a result of the information given to LUMPSTON and HUNTER,
CHS earned approximately $1000, while MCCURTY earned approximately $4000
to $5000." (Doc. 219, "EXHIBIT C.")

On August 28, 2008, Watkins sent a letter to ATF agent PETER BECK,
wherein he admitted: **"Leon Lumsden has been paying my cousin on the out-
side to get him information to obtain a 5K1 sentence reduction**." Watkins also
revealed, "Leon Lumsden has been paying off officers here to bring in drugs,
liquor, and food for him."  (Doc. 219, "EXHIBIT D.")

On September 2, 2008, ATF agent PETER BECK sent an E-mail to
Assistant United States Attorneys Angela Jordan, Gale McKenzie and Rafiq
Ahmad, wherein Beck informed the prosecutors:

> WATKINS just wrote me stating that LUMSDEN now
> falsely alleges that WATKINS has been selling info to

LUMSDEN in order to pass to law enforcement for favorable sentencing.  **WATKINS admits that his cousin, Katrina McCurdy, was an outside source that LUMSDEN was using to gain information**, but that he (Watkins) did not profit from it.  . . . . Several agencies have debriefed WATKINS and / or LUMSDEN.  HIDTA spoke to LUMSDEN, but didn't get any new intelligence.  . . . . Although I don't have reason to believe there (sic.) info is fabricated, **both WATKINS' and LUMSDEN's credibility are now in question. I'm not sure at this point if I could even approach another agency with either one's info,** given the current situation.

(Doc. 219, emphasis added, "EXHIBIT E.")

On September 3, 2008, MARCUS WATKINS sent a letter to AUSA Angela

Jordan admitting as follows:

> I do admit that I introduced a inmate named Leon Lumsden to my cousin Katrina McCurdy over the phone after weeks of letting him use my 3-way phone call to contact one of his girlfriends.  From those 3-way phone calls **he made a offer to my cousin Katrina McCurdy to pay her to get him new and current information to obtain a 5K1 sentence reduction." . . . . "When my cousin first started off providing Leon Lumsden with this information he would have his mother put the money on my account** and the very next day Katrina would come and get it off.  After doing this two or three times I told Leon Lumsden that he had to find another way to get her and Garrisous Davis their money because having the money on put on my account didn't seem right and made it look as though we had

something illegal going on." . . . .  "I'm now sending you a copy of those money transactions to prove to you that I haven't lied to you.  As you can see from the date of this print-out I obtained this print-out in May 2008."

(Doc. 219, "EXHIBIT F.")

On September 4, 2008, Assistant United States Attorney Gale McKenzie

sent an E-mail to AUSA Angela Jordan, ATF agent Peter Beck and Rafiq Ahmad

about Leon Lumsden which read as follows:

> **I advised all Federal and State law enforcement agents who contacted me about the possibility of interviewing Lumsden *that his credibility is nil. Anything they got from him would have to be independently verified by UC work, as he has repeatedly lied to law enforcement while purportedly cooperating and continued to commit major crimes while on bond awaiting sentencing.*** Nevertheless many from state and federal law enforcement debriefed him and reported receiving verified information of value as well as making arrests based on his cooperation. Many agents even showed up for his sentencing to speak with the judge themselves which resulted in Lumsden receiving a larger 5K reduction than requested by the government.  I(t) is very unfortunate that the court was not aware of the information in this email.  There will be no Rule 35.  Plse keep me advised.  **Is there any new crime for which I can prosecute Lumsden such as 18 USC 1001 violations?  Obstruction of justice**?? Gale

(Doc. 219, "EXHIBIT G." Emphasis added.)

### *FBI Agent Nikki Badolato's Interviews of Leon Lumsden.*

Following up on the inquiry from FBI Brownsville, FBI Agent Nikki Badolato decided to interview Leon Lumsden. (Doc.262-21). On October 1, 2008, Agent Badolato joined an interview of Leon Lumsden at the federal courthouse in Atlanta. Agents from a different agency were interviewing Lumsden about other matters. On October 1, Lumsden was a bit unprepared to meet with the FBI about the Marlon Burton drug organization. He requested that his attorney fax to the FBI his notes which contained more specific details about Burton. (Doc.262-22). Agent Badolato testified at the *Franks* hearing that this did not trouble her or raise a red-flag. (Doc. 262-62). Agent Badolato interviewed Leon Lumsden on October 1 and October 8, 2008, however, she did not write up reports of these interviews until December 5, 2008. (Gov. Ex.s 4&5; admitted at Doc. 262-23). At the October 1, 2008, meeting, "After being advised of the identities of the interviewing Agents and the nature of the interview LUMSDEN provided the following information:"

> Lumsden had been previously interviewed by DEA
> Special Agents Luther Bowen and David Cook.
> LUMSDEN provided information along with written
> notes to the DEA a couple of months prior pertaining to
> the MARLON BURTON, aka BIRD, Drug Trafficking
> Organization (DTO). LUMSDEN did not have a copy
> of his notes with him during the interview but stated that

he would have his attorney forward a copy to the Agents.

Lumsden thereafter described his "diagram" and knowledge of the BURTON DTO. BURTON is at the top of the Atlanta based organization. BURTON has been moving ton quantities of cocaine. BURTON does not front cocaine to anyone. He only sells 100 - 300 kilograms at a time. BURTON is associated with church charities. He has used church van's (i.e. for senior trips, etc. . . ) to transport cocaine.

BURTON has been involved with several companies. He is part owner of TARA Bonding Company, a mortgage company, Mercedes dealership, a record label, and his wife owns a boutique. BURTON owns additional homes all over the country.

LUMSDEN has contact with an individual, no [sic.] otherwise identified, who has close contact with BURTON and can provided [sic.] current information.

LUMSDEN knows BURTON to purchase his narcotics from individuals directly associated with Mexican drug cartels. BURTON is also buying and selling weapons.

BURTON is friends with ELDRIN BELL. BELL knows what BURTON's business really is, and looks out for him. BURTON gave money to VICTOR HILL's political campaign. BURTON's contacts allow him to "stay ahead of the game."

Atlanta Police Department Detectives PECK, GROGAN and STAPLER are familiar with some of BURTON's associates. They have made arrests within his organization in the past.

(Gov. Ex 5, FBI report of Oct. 1, 2008, interview).

On October 8, 2008, Agent Badolato interviewed Lumsden again, this time Lumsden had his notes.  On October 8, Lumsden was able to provide more details about the Burton DTO.  (Doc. 262-23).  On October 8, 2008, Lumsden provided the following information:

> LUMSDEN reviewed the faxed copy of the letter he written in March 2008 outlining MARLON BURTON's drug organization.  Agents had received a copy of the letter via facsimile from LUMSDEN's attorney (the letter has been placed in an FD-340 to be made a part of the file).
>
> LUMSDEN described MARLON BURTON as a black male, heavy set and in his late 30's.  BURTON's wife owns a clothing boutique named Expression, Hudson Bridge Road, Stockbridge, Georgia.  Burton lives in Stockbridge, Georgia.  BURTON is involved in real estate investments, he buys and sell houses on courthouse steps.  BURTON was also "locked up" when he was a juvenile.
>
> BURTON conceals drugs in cars that are towed by Dooley's.  The cars are then left in Home Depot parking lots, where BURTON has a trusted associate named LARRY DICKERSON, a black male in his early 50's, pick up the vehicles and take the drugs to a stash location.  BURTON occasionally will send others to pick up trucks loaded with narcotics and have them transported to stash locations.
>
> An individual named DWAYNE HARVEY was arrested last year with a ton of marijuana in a warehouse

located in Clayton County.  The drugs belonged to
LARRY DICKERSON and to another individual
arrested with HARVEY.   HARVEY owns a pick-up
truck he would load with drugs also.

BURTON often uses TARA BONDING to get his
"boys" out of jail.  BURTON deals with sources of
supply in the Mexican drug cartel.  BURTON also
distributes to people in North and South Carolina.

An individual named PAT PEARSON is an
associate of LARRY DICKERSON.  PEARSON meets
DICKERSON at his house across from Oak Hill (house
has a screened porch).

HARVEY had told LUMSDEN that BURTON has
cops in his pocket.   HARVEY has seen ELDRIN BELL
at BURTON's house.

An associate of BURTON's named PAUL DAVIS
is tied to a counterfeiting ring.

DICKERSON owns a construction company,
name unknown.  LUMSDEN feels as though
DICKERSON would "flip" if approached by law
enforcement.

(Gov. Ex 4).

At the *Franks* hearing, Agent Badolato testified that she never showed

Lumsden a picture or a photo lineup to confirm he actually knew Marlon Burton.

(Doc. 262-64).  At the October 8, 2008 interview, Lumsden was able to provide a

vague physical description of Marlon Burton.  (Gov. Ex. 4).

14

On November 3, 2008, AUSA TODD ALLEY and (then) First Assistant

United States Attorney SALLY YATES were advised by letter of the following:

> How far Watkins' operation went, and how many
> improper § 5K1.1 reductions were actually granted, we
> cannot be sure.  **We do know Leon Kelly Lumsden
> aka "Sharky"** *(1:07 CR 0312 (BBM)***) received
> information from Watkins and did earn a § 5K1.1
> reduction.**  Obviously, your office is best able to
> investigate the number and nature of § 5K1.1 reductions
> which were improperly obtained.

(Doc. 219, "EXHIBIT I.")

On November 5, 2008**,** agent BROSAS and AUSA McBurney re-

interviewed Watkins.  Watkins "advised that CHS (he) has provided information

to four inmates at the Atlanta City Detention Center (ACDC) for the purpose of

helping them obtain sentence reductions.  LEON LUMSDEN, also known as

"SHARKY," received the most information from CHS." (Doc. 219, "EX.  J.")

On November 7, 2008, AUSA Angela Jordan sent an E-mail to AUSA's

SALLY YATES, GENTRY SHELNUTT, THOMAS DEVLIN and TODD

ALLEY.  With this E-mail, AUSA Jordan included Agent BECK's summary of

Watkins' cooperation, including the following information: "On September 2,

2008, S/A Beck received a letter from WATKINS, who admitted arranging

information from his cousin to be funneled to Leon Lumsden, an inmate in his pod

15

at Atlanta Pretrial.  Apparently, WATKINS told Lumsden that he (WATKINS) was providing information to S/A Beck in an attempt to reduce his sentence. Lumsden then began contacting S/A Beck to attempt the same."  (Doc. 219, "EXHIBIT K.")

### *The Marlon Burton Wire Tap Affidavit an Application*

On November 25, 2008, FBI Special Agent Badolato swore to a wiretap application affidavit before the Honorable JULIE E. CARNES.  (Gov. Ex 8;  Doc. 219, "EXHIBIT A").  The affidavit contained information based upon information from two cooperating witnesses,  CW1 and CW2.  CW2 was Leon Lumsden. (Doc. 262-10).  In the affidavit, the FBI agent swore to the truth of following information:

> 31.   In September, 2008, CW2 was debriefed by agents. CW2 met BURTON approximately 3 years ago. CW2 knows several individuals who are close to BURTON, including people that know BURTON personally and others who work for BURTON's drug-trafficking organization. Through these contacts, CW2 knows BURTON as a high-level cocaine and marijuana distributor working in Georgia and surrounding states.
>
> CW2 knows that BURTON has been receiving his narcotic supply directly from his Mexican Cartel contacts.  According to CW2, BURTON has been running this drug distribution network for many years. BURTON has obtained significant amounts of cocaine

16

and marijuana on a regular basis from his Mexican contacts and has then laundered the drug proceeds through various businesses. CW2 reported that BURTON runs an organized, structured drug organization with numerous individuals working for him. According to CW2, BURTON has worked with long-time trusted individuals and is known to have law enforcement and political contacts that have enabled BURTON to remain undetected by law enforcement for years. CW2 said that BURTON has historically ordered between 100 to 300 kilograms of cocaine at a time from his Mexican contacts. CW2 knows that the narcotics have been secured inside vehicles that were towed behind trucks, brought to Atlanta and taken to meeting locations (often times to an unspecified Home Depot parking lot south of Atlanta). BURTON was then contacted by the Mexican suppliers and notified that the vehicles containing the narcotics had arrived. BURTON would send one of several trusted associates to the vehicle with the drugs and would have that person transport the car to one of several unknown stash locations throughout the Atlanta metro area. The drugs would then be unloaded. The vehicle would thereafter be returned to the same parking lot and left to be picked up by the unknown Mexican transportation contact. BURTON would then gather several of his regular distributors together at one time and would sell cocaine to them. BURTON would only place another cocaine order after the narcotics had been sold, and the distributors each agreed to take amounts equaling an order (as stated previously anywhere between 100 and 300 kilograms or more on occasion) significant enough to ship from Mexico. This process enabled BURTON to return the drug proceeds to his Mexican contacts in a timely fashion. According to CW2, BURTON has utilized this mode of operation for many years.

17

(Exhibit A, ¶ 31).

Agent Badolato also attested that "CW2 was arrested on federal fraud charges and is cooperating with the government in hopes of reducing his / her sentence. CW2's information has proven reliable in this investigation as well as in other local and federal investigations in the past. Where possible, I have attempted to corroborate CW2's information through other sources. Based on my investigation, I believe that CW2 is reliable. CW2 does not know CW1 and does not have any contact with him / her. CW2 was unaware that the government was investigation (sic.) BURTON for drug trafficking when he contacted the FBI." (Exhibit A, ¶ 31, footnote 5).

### ***Agent Badolato's Testimony at The Franks Hearing.***

At the *Franks* hearing on December 17, 2010, Agent Badolato testified that she was unaware of the information-for-sale scheme involving Watkins and Leon Lumsden, when she submitted the wiretap affidavit on November 25, 2008. (Doc. 262-20,44-46 ). Badolato testified that she would have searched Lumsden name through the FBI's "Indices" index, however nothing about the information-for-sale scheme was revealed. Agent Badolato also noted that she did not have access to the ATF's "N-Force" database.

Badolato testified that she used external databases to corroborate much of the information Lumsden provided to her in his March 2008 letter, an in his October 2008 interviews.  These external data base searched revealed that  Burton did have a house in Stockbridge, and his wife did have a boutique - "Expressions." The external data base searches revealed that certain individuals named by Lumsden were associated with addresses or property locations as described by Lumsden.  (Doc. 262-26,28).  Lumsden alleged that Burton was a big drug dealer. Badolato agreed - this was common knowledge "on the street." (Doc. 262-105).

However, Agent Badolato was unable to recall  any specific corroboration of the detailed inner workings of Marlon Burton's drug operation.  Lumsden provided specific details of a drug transport method which utilized "dually" pickup trucks and Home Depot parking lots.  Agent Badolato's investigation did not show any evidence of this transport method.  (Doc. 262-71-73,76 ). Furthermore, Agent Badolato made remarkably little inquiry into the underlying federal fraud cases against Leon Lumsden.  She did not know the details about his fraud charges, the fact that he had been sentenced or the length of his sentence. (Doc.262-20).  She did not know that Lumsden was known by the alias of "SHARKY." (Doc. 262-93).  Yet the underlying prosecution of Lumsden was brought by the FBI.  (*See* 1:05-CR-316 and 1:07-CR-312).  Although she labeled

19

Lumsden as credible, (Doc. 262-32), she never bothered to speak to Lumsden's prosecuting attorney,  AUSA GALE MCKENZIE.

At the *Franks* hearing, Agent Badolato admitted Leon Lumsden never participated in a drug transaction with Marlon Burton, and he never saw Burton in the presence of ANY narcotics.  (Doc. 262-75).  Furthermore, at the *Franks* hearing, Badolato admitted that when she submitted the affidavit in November of 2008, she knew that Lumsden was obtaining his information from an outside source.  Agent Badolato maintained that she disclosed the outside source / third-party origins of Lumsden's information in the affidavit.  Badolato, and the government now[6] suggest that use of the phrase, "through these contacts," within the sentence, "Through these contacts, CW2 knows Burton as a high-level cocaine and marijuana distributor working in Georgia and surrounding states," was a disclosure to Judge Carnes that none of the information was known, first-hand, by Lumsden.  (Doc. 262-35,36).

As shall be discussed below, IVEY GRANT submits this revisionist interpretation of the affidavit strains all credibility and credulity.

---

[6]  "Contrary to the defendant's claim, CW-2's information was properly qualified in the affidavit as originating from another person CW-2 knew." (Doc.159-4).

## ARGUMENT AND AUTHORITY

With his previously submitted exhibits, "A-S," and the testimony and exhibits presented at the *Franks* hearings,  IVEY GRANT has established by a preponderance of the evidence that the warrant affidavit contained material falsehoods and omissions which amount to a *Franks* violation.  On November 25, 2008, Agent Badolato swore to Judge Carnes that certain facts were true when they were not.   Furthermore, Agent Badolato omitted several crucial facts which would have affected Judge Carnes' decision to authorize the wiretap in this case. Agent Badolato's actions, and the government's inaction in this case amounted to a  reckless disregard of the truth.   The wiretap evidence should be suppressed on *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), grounds because the affidavit used to obtain court authorization for the wiretap (TT-1) contained gross material misrepresentations and omissions.

### *THE FALSEHOODS AND OMISSIONS*:

1) The first and most glaring falsehood / omission is that Lumsden purchased his information in the jail.  Agent Badolato presented Lumsden's information as first-hand knowledge which he actually knew to be true.  However, Lumsden did not personally know any information about Burton.  In August and September of

2008, the government knew Lumsden was purchasing information from Watkins and his cousin.  Front-line AUSA's Gale McKenzie, Todd Alley and Angela Jordan knew about this.  The upper echelons of the United States Attorney's Office, including Robert McBurney, Gentry Shelnutt, and Sally Yates knew about this.  ATF agents knew, as did Agent Brosas of the FBI who interviewed Watkins (about Lumsden and others) on August 26, 2008.  AUSA Gale McKenzie announced loud and clear on September 4, 2008, that Lumsden's **"credibility is nil."**  It was inexcusable for the government to submit Lumsden's tainted information to Judge Carnes on November 25, 2008.

> ### *Lumsden bought the information submitted in paragraph 31 of the affidavit.*

As of this date, the government has refused to concede the information attributed to CW2, was purchased by Lumsden in jail.  (Doc. 262-4).  Regardless, the evidence before the Court clearly establishes that Lumsden bought his information.   This Honorable Court had already indicated as such:

> THE COURT:  I think it's clear. If that's the only thing
> that we have, I don't think you need to do this letter.
> That's already understood, Lumsden bought the
> information. This Court is clear he bought the
> information.  Now, whether he got it from Watkins or a
> cousin or somebody's girlfriend, whomever, he bought
> the information.

(Doc. 261-37).

### *There is Only One Government at Work Here.*

The government cannot escape the consequences in this case simply by asserting that the right-hand was unaware of the doings of the left.  At the *Franks* hearings, the government went to great lengths to establish that the FBI drug unit, including Agent Badolato, was on the *10th floor* of the FBI building on Clairmont road, *in separately leased space*, whereas the FBI's public corruption unit, including MILE BROSAS, was on *the 2nd floor*.  Likewise, the government established that the ATF, including Agent Pete Beck, was *in a different building* at the Clairmont campus, not in the FBI building at all.

a) *Why Did the AUSA's and Agents not Talk Amongst Themselves ?*

Agent Badolato and the AUSA working with her on this wiretap demonstrated a reckless disregard for the truth by failing to discuss Lumsden's credibility with the person who would know it best - GALE MCKENZIE.  AUSA McKenzie was the assistant United States Attorney who had just prosecuted Lumsden in two cases.  It was not as if Lumsden was sentenced 5 years prior to the wiretap.  At the very same time Brownsville FBI agents were inquiring about Lumsden, July of 2008, he was being sentenced in the Atlanta Federal Courthouse.

Yet for reasons unknown, Gale McKenzie was not asked about Lumsden's credibility.  In August of 2008, federal prosecutors and agents knew about the information-for-sale scheme.   In September, prosecutors and agents learned of Lumsden's false allegations that AUSA McKenzie and ATF agents had attempted to cover up the shooting incident at the Game Room.  On September 4, 2008, Gale McKenzie wrote in an E-Mail to agents and prosecutors: " I advised all Federal and State law enforcement agents who contacted me about the possibility of interviewing Lumsden *that his credibility is nil."*

For reasons unknown to Mr. Grant, the upper echelons of the U.S. Attorney's office failed to send word or E-mail back down the chain of command to advise all federal prosecutors and agents that WATKINS and LUMSDEN were no longer deemed credible, and their information could not be used.  Simply because Agent Brosas worked on a different floor of the FBI building, or because Agent Badolato did not have the technology to search the ATF database or E-mails, this does not excuse the government for failing to disclose Watkins' and Lumsden's information-for-sale scheme (and lack of credibility), to Judge Carnes.

For reasons unknown, ATF Agent Beck and FBI Agent Brosas elected not broadcast their findings more broadly.  There was some suggestion that they

thought United States Attorneys would take care of such matters.[7]  They did not.
The government cannot hide now behind the premise that Agent Badolato could
not have discovered the information-for-sale scheme because - Lumsden's name
was initially spelled as LUMPSTON, or  because Brosas did not enter the recent
reports about Lumsden in the Indices system, or because Badolato did not have
access to the ATF "N–force" system, or  because Agent Beck put his findings in
an E-mail, rather than a report which could  be searched under the N-Force system.
We live in a high tech, post- 911 world.  In 2008, the government had the
knowledge  and capability to talk to itself.   It appears to have lacked the desire.

**b)  *Agents Badolato, Beck and Brosas All Worked for the Same,
United States Government.***

In many situations, the government is allowed to prevail (uphold a search)
on the theory of  "collective knowledge of the agents[8]."  The same rationale should
apply in this situation.  Mr. Grant directs this Honorable Court to persuasive
authority from other jurisdictions which holds that the government cannot be

---

[7]Agent Beck, "It was more of an internal matter."  (Doc. 261-17).

[8]Probable cause may exist based on the collective knowledge of law enforcement officials
derived from reasonably trustworthy information. *Madiwale v. Savaiko*, 117 F.3d 1321, 1324
(11th Cir. 1997).

excused in situations such as this, merely by claiming - one agent failed to advise the other.  Mr. Grant submits, the FBI is the FBI, and the government is the government:

> The United States may not, however, "recklessly remain ignorant" of its own informants, *United States v. Sullivan*, 586 F. Supp. 1314, 1318 (D.Mass. 1984), nor may it file and support this application as though the right hand knows not what the left hand does.  This means not only that the affiant must conduct the kind of thorough inquiries that the agents in this case have conducted, but further, that the federal officials of whom they inquire must make commensurate efforts to assure the accuracy of the information they supply.[3]
>
> Footnote 3.   The Court rejects the suggestion in *United States v. Dorfman*, 542 F. Supp. 345, 373 (N.D. Ill), *aff'd, sub nom.  United States v. Williams*, 737 F. 2d 594 (7th Cir. 1982), relied upon by the government, that "the test . . . is not the state of the mind of 'the government,' but the state of mind of the affiant."   This Court treats the affiant as a representative of the United States government as to the activities of any of its agents, whether or not the affiant has been made aware of those activities.  When the federal government is investigating and prosecuting criminal activity, it "should be viewed as a unitary whole." *United States v. Owens*, 933 F. Supp. 76, 86 (D. Mass. 1996).

*In re Application for Interception of Wire Communications*, 2 F. Supp. 2d 177, 178-79 (D. Mass, 1998).

FBI Agent Brosas admitted that when he learned of the Watkins / Lumsden

information-for-sale scheme, he had concerns that it could affect or taint other criminal prosecutions.  (Doc. 262-130).  However he failed to notify his fellow FBI agents.  A similar situation occurred in *United States v. Aviles*, where one agent intentionally failed to disclose to another the existence of material information.

> It is as a representative of the government that an applicant for a wiretap authorization applies to [*9] the court**.  The government cannot so compartmentalize its activities that it hides from the court information that might be relevant.**
>
> Tse's duty, if he had material facts, was enforceable by AUSA Canepa going to Tse's superiors in the DEA and obtaining reports she must have known he would have made. The sanction for failure to get these reports and for Tse's silence is the risk that the wiretap application be held invalid. Tse's failure to disclose reports in his possession was intentional on Tse's part, and his intention is attributable to Agent Allen. *See United States v. Jacobs,* 986 F.2d 1231, 1234 (8th Cir. 1993); *see also United States v. Wood,* 57 F.3d 733, 737 (9th Cir. 1995) (for *Brady* purposes, prosecutor charged with knowledge of material known to FDA). Tse's motive in withholding material information would have been irrelevant.

*United States v. Aviles*, 1998 U.S. App. LEXIS 38820, (9th Cir. 1998), at *9-10.  (Emphasis added).

C) ***Agent Badolato Swore to Judge Carnes that CW2's Information was First-Hand Personal Knowledge.***

At the *Franks* hearing, Agent Badolato asserted that she DID reveal in the

affidavit to Judge Carnes, that CW2's information came from a third-party source:

> Q. [By AUSA ERSKINE]   Now, you have already
> testified that Mr. Lumsden said he got the information
> from somebody else?
>
> A. [By Agent BADOLATO]   Yes.
>
> Q.  You disclose that in the affidavit?
>
> A.  Yes.
>
> Q.  Where do you disclose that?
>
> A.  . . .  In paragraph 31.    It is,
>
> "CW-2 knows several individuals who are close to
> Burton, including people that know Burton personally
> and others who work for Burton's drug trafficking
> organization.  Through these contacts CW-2 knows
> Burton as high-level cocaine and marijuana distributor
> working in Georgia and surrounding states."
>
> Q. And then throughout the paragraph that follows you
> say,   "CW knows" and "CW knows" or "CW reported" I
> guess is further down. Why do you use that instead of
> continually repeating that he knows through these
> contacts?
>
> A. I felt as though I was making it clear by noting it at
> the beginning of the paragraph that he knows this
> information because of people who are close to Burton.
> And instead of repeating that sentence over and over
> again throughout, basically it is the style of writing, you
> know, I continue with "he knows." stipulating the fact

that I have already said it he knows because of other
people close to Burton.

(Doc. 262-35-36).

The government put forth this same absurd argument in a previous pleading.
(Doc.159-7,8).   To put it nicely - Agent's Badolato's omissions were bad, and her
justifications after- the-fact were worse.

"Through these contacts" did not inform Judge Carnes that this information,
covering two complete pages, was pure hearsay.  "Through these contacts"
suggests an actual, real-time, drug dealing relationship with Burton, consistent
with "CW2 met BURTON approximately 3 years ago."   For  paragraph 31 to
convey the meaning the government now suggests , Agent Badolato should have
written "**from** the contacts, CW2 learned the following ...."  Although Badolato
and the government would like to rewrite history, the plain-meaning of the words
remains on the page.  The words cannot and should not be perverted to provide an
entirely different new meaning.

The context of the first sentences of Paragraph 31 contradicted this recent
interpretation, and further misdirected Judge Carnes.  "CW2 met Burton
approximately 3 years ago.  CW2 knows several individuals who are close to
Burton, including people that know Burton personally and others who work for

29

Burton's drug trafficking organization." These first two sentences imply an actual drug-dealing relationship with Burton. As Badolato admitted at the *Franks* hearing, Lumsden NEVER did a drug deal with Burton and he never saw Burton in the possession of any drugs. "Through these contacts" suggests that CW2 had drug-related contacts WITH Burton. If the government was honestly submitting this as 3rd party hearsay, learned by CW2 "through his contacts," it should have been more transparent about it.

The government's argument is contradicted further by the plain language of the remainder of paragraph 31, and the specific detail therein contained:

> *CW2 knows* that BURTON has been receiving his narcotic supply directly from his Mexican Cartel contacts. *According to CW2*, BURTON has been running this drug distribution network for many years. BURTON has obtained significant amounts of cocaine and marijuana on a regular basis from his Mexican contacts and has then laundered the drug proceeds through various businesses. CW2 reported that BURTON runs an organized, structured drug organization with numerous individuals working for him. *According to CW2*, BURTON has worked with long-time trusted individuals and is known to have law enforcement and political contacts that have enabled BURTON to remain undetected by law enforcement for years. CW2 said that BURTON has historically ordered between 100 to 300 kilograms of cocaine at a time from his Mexican contacts. *CW2 knows that the narcotics have been secured inside vehicles that were towed behind trucks, brought to Atlanta and taken to meeting*

> *locations (often times to an unspecified Home Depot parking lot south of Atlanta).  BURTON was then contacted by the Mexican suppliers and notified that the vehicles containing the narcotics had arrived.  BURTON would send one of several trusted associates to the vehicle with the drugs and would have that person transport the car to one of several unknown stash locations throughout the Atlanta metro area.  The drugs would then be unloaded.  The vehicle would thereafter be returned to the same parking lot and left to be picked up by the unknown Mexican transportation contact.  BURTON would then gather several of his regular distributors together at one time and would sell cocaine to them.  BURTON would only place another cocaine order after the narcotics had been sold, and the distributors each agreed to take amounts equaling an order (as stated previously anywhere between 100 and 300 kilograms or more on occasion) significant enough to ship from Mexico.  This process enabled BURTON to return the drug proceeds to his Mexican contacts in a timely fashion.  According to CW2, BURTON has utilized this mode of operation for many years.*

(Doc. 219, "EXHIBIT A," paragraph 31.  *Italics added.*)

The attempts by Agent Badolato and the government to incorporate by reference the remained of paragraph 31, as a summary of what CW2 was told by his contacts - is preposterous.   Paragraph 31 simply does not say this.  Paragraph 31 says CW2 **knows** these things.  It is an abomination of the English language, and a flat lie, to suggest paragraph 31 advised the district court that this information was coming from a third party.

Agent Badolato's testimony at the *Franks* hearing was astounding:

> Q. [By AUSA ERSKINE]  Okay**.  And Mr. Lumsden's information, did he portray it to you as first-hand information during that interview**?
>
> A. [By Agent Badolato]  **Actually he told us that he had received the information from a girlfriend**.
>
> Q.  Tell me about the context of that, receipt of that Information.  How did he come upon that?
>
> A.  **He was involved with a female who he would not name, was trying to protect her identity**, and said that this female had also at some point had an intimate relationship with Marlon Burton, and that she knew the information from Marlon Burton.
>
> Q. And had passed that information to him?
>
> A.  Yes.

(Doc. 262-26-27).  (Emphasis added).

This is a *Franks* violation in, and of itself.  The FBI agent admitted that she knew Lumsden's information came from an unknown and un-named girlfriend, whom he did not want to identify.  The agent admitted that she knew this when she wrote the affidavit.  The real source of the information, of which the agent knew NOTHING, had a romantic relationship with Burton at some point.  Meanwhile, Judge Carnes was led to believe that the information about Burton was coming

from CW2, a reliable, credible and tested informant.

Another blow to the government's attempt to rewrite history, are the FBI reports written by Agent Badolato to record the October 2008 interviews of Lumsden,  Government's Exhibits 4 and 5.  Throughout four (4) pages of reports, (which she wrote on December 5, 2008, 10 days *after* she submitted the affidavit), Agent Badolato again records Lumsden's information as first-person information, not something he learned over the phone from a girlfriend.  The report of the first interview, does include the sentence "LUMSDEN has contact with an individual, no (sic.)  otherwise identified, who has close contact with Burton and can provide current information." (Gov. Ex. 5).  Neither of the reports reveal - Lumsden learned all his information from the girlfriend, or otherwise "through these contacts."  In short, Agent Badolato knew the information came from a different, unreliable source, but she re-packaged it passed it off as reliable information

> Q. [By Attorney FINLAYSON]: **In the first meeting, did he tell you in the first meeting he is getting his information from his girlfriend, or this woman he has a relationship with?**
>
> A. [By Agent BADOLATO]  **Yes.**
>
> Q.  Did you put that in your report?
>
> A. The third paragraph from the bottom.  Lumsden has

contact with an individual not otherwise identified, who has close contact with Burton and can provide current information.

Q.  Okay. You don't write this report as if all of his information is just coming from someone else, do you?

A. This is just a summary of the information that he provided.

Q.  Is it your testimony here that when you wrote this report, you are writing this whole report as information he got second-hand from somebody else, nothing that he had first-hand knowledge of?

A.  I am writing it exactly -- not exactly. I am writing the a summary of the information that he provided.   And yes, he did tell us during this interview that he was getting information from a girlfriend.

Q.  **Did he tell you that that was his source for this information?**

A.  **Yes.**

(Doc. 262-63-64)(emphasis added).

 Like the affidavit, the FBI reports, Government's Exhibits 4 and 5, fail to properly reflect the source of the information.  Although Agent Badolato knew Lumsden was getting his information from an outside source back in 2008, she disguised and buried this fact in her reports, just as she did in the affidavit.

## OTHER FALSEHOODS AND MATERIAL OMISSIONS.

2) **The date of the interviews**.  Albeit independently minor, the affidavit falsely reads that Agent Badolato interviewed CW2 in September of 2008.  It was October.

3)  **Identity of Burton.**  Agent Badolato failed to disclose that Lumsden never identified Burton from a photograph, and failed to provide a physical description which denoted any indicia of reliability.

4) **No drug history with Burton**.  The affidavit failed to reveal that Lumsden had never been involved in a drug transaction with Burton or seen Burton with narcotics.  (Doc. 262-75)

5) **Lumsden's criminal record.**  The affidavit mentions that Lumsden was "arrested on federal fraud charges."  It omits that Lumsden had been convicted and sentenced to 135 months for two separate fraud cases, and that his bond was revoked for committing new crimes after promising to cooperate.

6)  **Lumsden was aware that the government was investigating Burton when he contacted the FBI.**  Several agencies had looked at Burton in the past.  This was common knowledge on the street.  The FBI did not inadvertently discover that Lumsden knew about Burton.  Before he was interviewed by Badolato in October,

Lumsden was interviewed by DEA about Burton.  The March 2008, letter from Lumsden, demonstrates that Lumsden knew Burton was a "hot" government target.  Lumsden named Marlon Burton almost immediately.   He was shopping the information, hoping to get interest from federal agents who could help him reduce his sentence.  Lumsden clearly was an eager seller of information.  He knew that Marlon Burton was good "bait."

7) **The affidavit omitted that AUSA Gale McKenzie determined that Lumsden's "credibility is nil."**   Furthermore, the affidavit omitted that Lumsden brought false accusations against Gale McKenzie, a veteran Assistant United States Attorney, claiming that she in ATF agent Beck had covered up a gang-related shooting at the Game Room.

8)  **Lumsden had guards smuggle drugs into ACDC**.  While he was supposed to be cooperating with federal authorities, Lumsden was breaking the law again. This was omitted from the affidavit.

## EVALUATION OF REMAINING WARRANT  FOR PROBABLE CAUSE.

Mr. Grant has proven by a preponderance that the misrepresentations and omissions were knowingly and recklessly made by Agent Badolato.  The result of excluding the alleged misrepresentations and including the alleged omissions

would have been a lack of probable cause for issuance of the wiretap warrant. *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990).  With the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause.  The wiretap warrant must be voided and the seized conversations excluded to the same extent as if probable cause was lacking on the face of the affidavit."  *Franks v. Delaware,* 438 U.S. at 156, 98 S. Ct. at 2676.

In Mr. Grant's case, there was insufficient evidence to conclude there was probable cause to initiate the wiretaps once CW2's information is removed from the affidavit.  The information from CW1 was insufficient and wrought with its own problems.  According to Badolato, CW1 is thought to be dead[9].  If CW1 was dead, or suspected of being dead, before November 25, 2008, this amounts to another material omission.

Furthermore, the information from CW1 was stale.  As agent Badolato admitted, CW1's last drug deal with Burton was **in 2003**. (Doc. 262-51).  What little information there is in the affidavit is stale in time, as it did not suggest that Marlon Burton's telephone conversations on TT-1 would contain the desired

---

[9] Mr. Grant is still awaiting *Brady* information from the government as to when it suspected that CW1 had met his demise.  (Doc. 262-83).

evidence at the time the wiretap warrant was obtained.  *See United States v. Green*, 40 F.3d 1167 (11th Cir. 1994).  As indicated by paragraphs 1 through 10 of the affidavit, CW1 appeared to have had a drug related relationship with Marlon Burton back in 2003.  Although the agents and CW1 attempted to rekindle this drug dealing relationship in August of 2008, it failed.  There was insufficient evidence in the affidavit after August of 2008, to establish probable cause.

"An application for a wiretap authorization must be supported by the same probable cause necessary for a search warrant." *United States v. Gonzalez Perez,* 283 Fed. Appx. 716, 721 (11th Cir. 2008).  One of the requirements of 18 U.S.C. § 2518(3), which governs issuance of wiretap orders, is that the issuing court must find that "there is probable cause for belief that particular communications concerning [the] offense will be obtained through such interception." "The issuing [court] is to make a 'practical, common-sense decision' about whether the 'totality of the circumstances' indicate that there is probable cause that the sought-for evidence will be obtained." *Gonzalez Perez,* 283 Fed. Appx. at 721 (quoting *United States v. Nixon,* 918 F.2d 895, 900 (11th Cir. 1990)).  Information supporting the application for a wiretap must show that probable cause exists at the time the wiretap order is issued. *United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000).  With the bought information from CW2 excised, the

38

affidavit was insufficient as probable cause was lacking.

### THE LEON GOOD FAITH EXCEPTION IS INAPPLICABLE TO THIS CASE.

Admittedly, the Leon good faith exception can save a deficient wiretap warrant. However, the Leon exception is wholly inapplicable in certain circumstances, such as when the affidavit includes information obtained through unconstitutional action and or use of materially false statements. The Leon exception does not apply (1) where the judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing judge wholly abandoned his or her detached and neutral judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. *United States v. Martin*, 297 F.3d 1308, 1311 (11th Cir. 2002) (internal quotations and citations omitted). Suppression in this case is appropriate as the agent was dishonest and reckless in preparing her affidavit and could not have harbored an objectively reasonable belief in the existence of probable cause. *Leon*, 468 U.S. at

926.

The facts of this case are very troubling.  It is to be hoped that this case is an anomaly, that there are not more Marcus Watsons and Leon Lumsdens out there fabricating evidence to be used in warrant affidavits.  Judge Carnes would never have issued the wiretap warrant in this case had she been advised of the truth that the information from the so-called "reliable cooperating witness" was actually third-party hearsay which the inmate had purchased in the jail.  This is not mere speculation by Mr. Grant.  At a hearing on January 29, 2010, related to Marcus Watkins' motion to compel the government to file a 5K1.1, Judge Carnes stated the following:

> THE COURT:  Here's what I don't understand and obviously **there is something going on that doesn't go on in my Court**.  **The government is allowing people who don't have any knowledge of a particular crime to get the credit for the cooperation rendered by a family member or friend on the outside.  These would be people in jail.  And they are allowing them – like the Hessian soldiers in the revolutionary war, they are allowing this to happen ?**
>
> MS. STEWART: I describe that as vicarious cooperation.
>
> THE COURT: Is this happening a lot ?
>
> MS. STEWART: I hope it's not happening a lot, Your

Honor, because I know at least institutionally we have a concern about it.

THE COURT: **But apparently it's been going on with agents knowing.  Obviously I guess the agent, if somebody is in jail and is talking about something happening contemporaneously, the agent necessarily knows that somebody else is giving the information.**

MS. STEWART: Right.  And, Yes, I think that's just the way general information often works, like Mr. Watkins was saying himself, but when you start to pay for information, I think that's different.

THE COURT: In your case, it wasn't the agents giving money to the cooperator; it was the defendant himself giving the cooperator money ?

MS. STEWART: That's my understanding, Your Honor.

THE COURT: Boy, that's a bad idea.  And what agency was doing this ?

MS. STEWART: Secret Service.

AGENT BECK:  **That's the FBI,** Mary Jane.

MS. STEWART: Oh, FBI ?  I beg your pardon.  So when I said Secret Service before, it should have been FBI.  I didn't know.

THE COURT: Well, I mean **I think maybe in my almost 18 years, there may have been a couple of times I acknowledged something like this, but I've pretty much made it clear this is just bad**.  And, you know, whether or not a defendant outright tells an agent

41

I'm paying somebody they have got to know that there is potential for this to happen, and **they have got to know that all they are doing is they may be getting real good information, they may be getting perjured information, but it is an abominable situation and I am really appalled that it is going on to the level it appears to be going on.**

(Doc. 219, "EXHIBIT L;" *United States v. Marcus Watkins*, pp.115-116, emphasis added.)

_____WHEREBY, for those reasons put forth above and in his original motions, supplements and reply, IVEY GRANT requests that the wiretap evidence in his case be suppressed.

_____ Dated:  This 14th day of February, 2011.

Respectfully submitted,

*s/ L. Burton Finlayson*

_____

L. BURTON FINLAYSON
Attorney for IVEY GRANT
Georgia Bar Number: 261460

LAW OFFICE OF
L. BURTON FINLAYSON
931 Ponce de Leon Avenue, NE
Atlanta, Georgia 30306
(404) 872-0560

## CERTIFICATE OF SERVICE

This is to certify that I have this day electronically filed the foregoing Brief with the Clerk of Court using the CM/ECF system which will automatically send email notifications of such filing to the following:

> Mr. Kurt Erskine
> Assistant United States Attorney
> 600 Richard B. Russell Building
> 75 Spring Street, S. W.
> Atlanta, Georgia  30303.

DATED:  This 14th day of February, 2011.

*s/ L. Burton Finlayson*

_____
L. BURTON FINLAYSON
ATTORNEY FOR IVEY GRANT
State Bar Number: 261460