## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| **vs.** | : | |
| | : | **NO. 1:09-CR-482-TWT-LTW** |
| **IVEY GRANT** | : | |

### GOVERNMENT'S RESPONSE TO
### DEFENDANT'S MOTION TO SUPPRESS WIRETAP EVIDENCE

Comes now the United States of America, by and through Sally Quillian Yates, United States Attorney and Kurt R. Erskine, Assistant United States Attorney for the Northern District of Georgia, and files this response to defendant Ivey Grant's (the "defendant") motion to suppress wiretap evidence (Docket Entry (Doc.) 130). The United States respectfully submits the motion should be denied. In support of its position, the Government states as follows:

### I. STATEMENT OF FACTS

#### A.   *Procedural Background*

On December 8, 2009, the defendant was indicted by a federal Grand Jury sitting in the Northern District of Georgia for his participation in a drug conspiracy (Doc. 35) and, on March 30, 2010, the defendant filed a motion to suppress wiretap evidence. (Doc. 130). In his motion, he seeks to suppress evidence obtained through wiretaps employed by the Federal Bureau of Investigation (FBI) as part of its

investigation of the Marlon Burton drug organization. (Doc. 130). Specifically, the defendant seeks to suppress his intercepted communications obtained through the monitoring of Target Telephone 1.

On June 4, 2010, the Government filed its initial response to the defendant's motion to suppress. (Doc. 163). On September 20, 2010, the defendant filed a supplemental brief. (Doc. 218). On September 22, 2010, the defendant supplemented his supplemental brief with supplemental pleadings. (Doc. 220). On October 8, 2010, the Government filed a responsive brief. (Doc. 226). On October 21, 2010, the defendant filed a reply brief.

The Court subsequently ordered that a hearing be held and, on December 17, 2010, FBI Special Agents Nikki Badolato and Eulis Mile Brosas testified. (Doc. 248). The hearing was continued and, on January 6, 2011, the proceedings were reconvened so that Special Agent Peter Beck could testify. (Doc. 256). On February 14, 2011, the defendant filed his post-hearing brief. (Doc. 263). This response ensues.

### B.    Factual Background

### 1.    *The Burton Investigation*

The hearings related to whether Special Agent Badolato deliberately made misstatements or acted with reckless disregard for the truth when she presented the

wiretap affidavit for Target Telephone 1 to the District Court. During the hearing, the Government called Special Agent Badolato to testify.

At the hearing, she testified she began to investigate the Marlon Burton (Burton) drug trafficking organization in the summer of 2008. (T. 8).[1] Initially, the FBI was contacted by the Brownsville, Texas office about the case. (T. 8-9). According to this information, Burton and his organization were getting significant quantities of cocaine and marijuana from a source in Mexico. (*Id.*). The Brownsville agents previously met with Burton in Atlanta during the course of the investigation and, during these meetings, Burton expressed his interest in trafficking drugs for the cartel. (*Id.*). Shortly thereafter, the agents in Texas asked for assistance from the Atlanta office. (T. 10).

During the course of the Burton investigation, Leon Lumsden was identified by the FBI as having information on the Burton organization. (T. 11). Specifically, the Brownsville agents located a letter sent by Lumsden concerning Burton. (*Id.*). The letter had originally been received by the FBI on March 14, 2008 and was processed as a "general complaint." Normally, when mail or telephonic complaints are received by the FBI, a duty agent will route the complaint to the squad supervisor

---

[1]  The transcript from the hearing on December 17, 2010 will be referred to as "T" herein. "T2" refers to the hearing held on January 6, 2011.

who handles the particular violation. (T. 12). In this case, because there was no open file on the Burton organization, Lumsden's letter was sent to a general control file. (T. 13). After reviewing the letter, Special Agent Badolato believed that Lumsden's information was consistent with the information the FBI had learned in conducting the Burton investigation. (T. 15).

An analyst reviewed the FBI Indices Database to determine if there entries relating to Lumsden after reviewing the letter. In the database, there were entries showing that Lumsden had been involved in mortgage fraud or a financial fraud investigation, but nothing more. (T. 19). Similarly, in running his criminal history, it showed that Lumsden had been involved in fraud. (T. 20). There was no reference in Indices to buying and selling information or any investigations relating to this subject. (*Id.*) In fact, Special Agent Badolato only became aware of this allegation in early 2010, after the conclusion of the Burton investigation. (*Id.*) Special Agent Badolato, as part of her investigation, also conducted a public records search that gave Lumsden's background, addresses, property ownership and other public record information. (T. 21.) After reviewing this information, she decided to interview Lumsden.

Lumsden was interviewed on October 1, 2008 and again on October 8, 2008 by Special Agent Badolato and another agent. (T. 22-23). During the interviews,

they discussed in detail the information that Lumsden had concerning the Burton

organization. (*Id.*) The agents also reviewed Lumsden's detailed handwritten notes

regarding the organization that gave specific names and addresses of those involved.

(T. 24). The notes also gave insight on the way that Burton moved his drugs. (*Id.*).

During the interview, Lumsden provided information concerning Burton generally,

noting he operated a clothing boutique in Stockbridge, Georgia. (*Id.*). This was true

and was consistent with the information that the FBI's investigation had uncovered

to that point. (T. 25).

During the interview, Lumsden never represented to Special Agent Badolato

that the information was first-hand. (T. 26-27). He explained that it came from a

girlfriend, who he would not identify. (T. 27).

Special Agent Badolato took Lumsden's information and checked it against

FBI and other databases to determine whether it was accurate. (T. 26). This research

confirmed there were a number of links between the people identified by Lumsden.

(*Id*). In November, 2008, Special Agent Badolato began drafting the wiretap

affidavit. (T. 32).

At paragraph 31 of the affidavit, she summarized her two interviews with

Lumsden. (T. 35). In the first sentence of the paragraph, she specifically disclosed

that Lumsden knew "several individuals who are close to Burton, including people

that know Burton personally and others who work for Burton's drug-trafficking organization." (*See* affidavit for TT1 at para. 31).  Lumsden told the agents that Burton was well-known by others in the community as being a long-term drug dealer. (T. 98).  Through these contacts, Lumsden knew the information described in the paragraph. (*Id.*)  She explained at the hearing that she did not repeat the "through-these-contacts" language for every sentence of the paragraph because she felt she had clearly stated the source of Lumsden's information in the first sentences. (*Id.*)  Her agency report also noted that the information came from Lumsden's girlfriend. (T. 63-64, see Gov't Ex. 4).

In her affidavit, she disclosed that Lumsden was involved in a fraud case and that he was cooperating to get a reduced sentence. (T. 37).  She also noted that Lumsden had provided reliable information in the past in other investigations. (*Id.*) At the time the affidavit was signed, she was aware that Lumsden had successfully cooperated with other law enforcement officers. (*Id.*)  Specifically, she knew that Lumsden had assisted another agent in an intellectual property investigation. (*Id.*) She noted for the Court that, based on her investigation, Lumsden's information appeared to be reliable. (*Id.*)

Ultimately, Lumsden's information did prove to be reliable. (T. 39).  The Burton organization did distribute significant quantities of narcotics in the manner

that he described.  (*Id.*)  Burton is now serving a lengthy prison sentence.

### 2.    *The Watkins Investigation*

In the fall of 2008, FBI agent Mile Brosas and ATF agent Peter Beck were investigating allegations that inmates were buying and selling information at the jail. (T. 108).  Special Agent Brosas is an agent assigned to the FBI's Public Corruption Squad.  (T. 42).  During the course of his investigation, the agents interviewed Marcus Watkins, who identified two of the inmates to whom he sold information.  (T. 109).  One of the inmates was Lumsden.  (T. 110).

At the hearing, Special Agent Brosas explained that he did not enter Lumsden's name into the FBI's Indices Database.  (T. 115).  He stressed that he does not index every name during the course of an investigation.  (*Id.*)  As a preliminary matter, when Lumsden was identified, the agent had not corroborated whether Watkins' allegations were true, so he did not enter the information into the FBI's indexing system.  (*Id.*)  Moreover, Lumsden was not a subject or target of the investigation. (T. 124).  After the fall of 2008, Special Agent Brosas did no further investigation into the scheme.  (T. 120).

Similarly, Special Agent Beck testified that he did not contact Special Agent Badolato to inform her of the allegations concerning Lumsden.  (T.222).  In fact, he was unaware Lumsden was dealing with any other agents at all.  (*Id.*)  Special Agent

Beck testified he worked in a separate building from the FBI and did not come into contact them. (T.223). In documenting his interview of Lumsden, Special Agent Beck likely did not refer to him by name because of his role as a confidential informant. (T.228).

Special Agent Badolato was unaware of Special Agent Mile Brosas or Peter Beck's investigation into Watkins and Lumsden. (T. 42).[2] Special Agent Brosas did not brief her or any other drug agents working with Special Agent Badolato on the Watkins investigation, nor did he copy them on correspondence relating to the case. (T. 122,127-128). She noted that even if she had searched for Lumsden's name in the FBI Indices system, she would not have found him, as Lumsden's name was misspelled as "Lumpston." (T. 41,123). Similarly, she was unaware of ATF agent Peter Beck's involvement with the Lumsden case and does not know him. (T. 44).

In 2008, she also was not working any cases with these agents or the Assistant United States Attorneys working on the Watkins case. (*Id.*). Special Agent Badolato and the agent working with her were never copied on any of the correspondence relating to the matter, nor did they brief her on it. (T. 44-45.). Finally, nobody on her squad was involved or informed of the investigation. (T. 46).

---

[2] Special Agent Badolato works OCDEFT cases and they do not work in the same space. (*Id.*).

8

## II. LEGAL ARGUMENT

### A. The Defendant's Motion to Suppress Should Be Denied Because There Was Probable Cause to Initiate the Wiretap Even If the Disputed Portion of the Affidavit Is Disregarded.

"Affidavits supporting arrest warrants are presumptively valid." *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir.2009). "When assessing whether the alleged false statements and omissions were material, the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false and misleading." *Id.* However, "even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *Id.* (quoting *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir.1997)).

> The Supreme Court made it clear in *Franks* that in order to be entitled to relief a defendant must show not only that misrepresentations or omissions were intentionally or recklessly made, but also that, absent those misrepresentations or omissions, probable cause would have been lacking. That is the test of materiality, and materiality is essential no matter how deliberate or reckless the misrepresentations were.

*United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001).

Further, the defendant bears the burden of showing that "absent those misrepresentations or omissions, probable cause would have been lacking." *Id.*; *see also United States v. Cross*, 928 F.2d 1030, 1040 (11th Cir. 1991)(holding that, even

after the challenged portions of the affidavit were redacted, there was still sufficient

evidence to establish probable cause for the search).

In *United States v. Weber*, the defendant also moved to suppress the wiretap

in the case, arguing that the agent had falsified portions of his affidavit in support of

the order. 808 F.2d 1422, 1424 (11th Cir. 1987). Pursuant to *Franks*, the Eleventh

Circuit stressed that

> We need not decide, however, whether Renton's allegedly contradictory statements amount to a deliberate falsehood sufficient to invoke the *Franks* doctrine. We may assume, contrary to all indications, that the challenged statements were fraudulent. The Supreme Court has noted that 'when material that is the subject of the alleged falsity ... is set to one side, [and] there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.' The district court determined that, even after setting aside Renton's allegedly fraudulent statements, the information remaining in the affidavit was 'abundantly sufficient to support probable cause.' We agree. Thus *Franks* commands that, despite any presumed deficiency in Renton's affidavit, the wire communications were legally obtained, and thus admissible.

*Id.* (citations omitted).

In *United States v. Novaton*, the Eleventh Circuit found that the affiant either

intentionally or recklessly reported in a wiretap affidavit that two confidential

informants had provided truthful information in the past. 271 F.3d 968, 987 (11th

Cir. 2001). In truth, the informants had provided no such information. *Id.*

The Eleventh Circuit, however, held that the statements concerning the past

reliability of the informants, when viewed in the context of all the information contained in the affidavits, were immaterial.  The affidavits contained extensive factual detail that was independent of the informants' statements and supported probable cause.  Under these circumstances, even assuming the affiant agent's statements concerning the informants' past reliability were deliberately false and subtracting those statements from the affidavits, there was still ample showing of probable cause. *Id.*

In the instant case, even without paragraph 31 of the affidavit, there was overwhelming evidence supporting probable cause.  The affidavit included the following information, which was unrelated to CW-2:

1.   In late June, 2008, CW-1 told agents that Marco Duron supplied Burton with 100 kilograms of cocaine.  The majority of the cocaine was "fronted" (full payment expected at a later time).  Burton paid the balance due for the 100 kilograms in full within three days of receipt. It was also believed that this organization, under Burton's direction, was the source of a significant and regular supply of cocaine in and around the Atlanta area for a considerable period of time.  Telephone analyses of cellular telephones utilized by Burton (including Target Telephone 1) revealed that Burton maintained regular telephonic contact with numbers based in Mexico, a known drug source country.  Exhibit A at ¶ 17.

2.   In June 2008, CW-1 contacted Burton at the direction of agents.  CW-1 represented to Burton that he/she was a highly-placed member of the drug cartel.  CW-1 had dealt with Burton in the past prior to working with law enforcement.  CW-1, or his associates, regularly supplied Burton with narcotics prior to CW-1 working with the FBI.  CW-1

inquired of Burton whether a new narcotics supply line could be established and managed by Burton in Atlanta. Burton agreed and set up a meeting with CW-1 in Atlanta. This call was not recorded, but conducted under the supervision of and in the presence of agents. *Id.* at ¶ 18.

3.   On July 17, 2008, Burton met in person with CW-1 and an undercover FBI agent, who was posing as an associate of CW-1 (hereinafter referred to as "UCE"). This meeting was not recorded, but the UCE was present at all times. Burton picked the individuals up from downtown Atlanta and drove them in his Mercedes sedan to his residence located in Eagle's Landing Country Club. Burton wanted them to see his residence to prove that his narcotics operation had been profitable. Burton stated that he owned a business, but that his real money came from cocaine distribution and he did not want the Internal Revenue Service coming around his business and seeing where his money came from. During the meeting and at the direction of agents, CW-1 provided Burton with a list of names that Burton was to have "checked" through his law enforcement contacts. Burton took the list and stated that he would have them checked. At the meeting, the parties also discussed a drug debt Burton owed to the cartel from a previous drug transaction several years ago. Eventually, it was agreed that the total amount owed by Burton was $130,000. Burton said he wanted to clear his debt in hopes of becoming the "sole" distributor of cocaine in the Atlanta area. *Id.* at ¶ 19.

4.   The discussion thereafter changed to negotiating how much each kilogram of cocaine would cost Burton. Burton expressed that the prices had been fluctuating and that the current cocaine product in Atlanta was weak. Burton said he wanted to try and "control" the cocaine market in the Atlanta area. A price of $20,000 per kilogram was agreed upon. Burton said he would actually pay $21,000 per kilogram until his previous drug debt was repaid. Burton further explained that he would pay $50,000 up front as a good faith effort to repay the debt. Burton then discussed plans to develop a 52-acre plot of property that he intended to use to establish a base of operation to control the cocaine business in Atlanta. Burton explained he was in the process of

12

negotiating a deal to buy the property from the owner. During the meeting, Burton called the owner of the property and was advised that the property was no longer for sale. Burton continued making various telephone calls to individuals inquiring about other secluded properties. Burton offered to locate properties and rentals to be used for the drug operation. Burton stated that he wanted to run the drug business exclusively out of Atlanta. Burton explained that this would help keep the narcotics operation safe from people cooperating with law enforcement. Shortly thereafter, Burton drove CW-1 and the UCE to a residence under construction south of Atlanta. Burton explained that he had constructed the residence and that the home and the residence across the street (which he also constructed) could be utilized as stash houses for the narcotics operation. *Id.* at ¶ 20.

5.    Another meeting was scheduled on August 11, 2008 between the UCE and Burton. The UCE was posing as an associate of the drug cartel. The meeting was to take place in a hotel in Atlanta. After a series of telephone calls between the UCE and Burton, it became clear that Burton had become suspicious. During a subsequent call between the UCE and Burton, Burton stated that his "little friend" (Burton's unknown drug cartel contact) was unaware of anyone from the cartel traveling to Atlanta. He said this information greatly concerned him. Consequently, the meeting did not take place. *Id.* at ¶ 21.

6.    On July 30, 2008, there was a consensually-recorded conversation between Burton and the UCE. During the call, Burton explained to the UCE that three of the names from "the list" had been checked. Burton said he had to send his "guy" more money and that there was one additional name to be checked. The UCE and Burton discussed when the UCE could travel to Atlanta to obtain the results of the name checks. Burton explained that he did not have all of the results. He added that he had the names checked through Los Angeles as to not send any "red flags" (alert law enforcement authorities). Burton added that he could show the UCE his own "set-up" with houses (referring to the locations where his distribution network actively functions). Burton advised that they could come here and use his "set-up" the first time and that on the second time he would get houses (for the narcotics operation). Burton

advised that everyone was ready and wanted to "get the ball on the roll" and get started (with the narcotics operation). Burton advised that everyone was waiting on him and wanted to get started. The two agreed to talk again. *Id.* at ¶ 23.

7.    On August 1, 2008, there was a consensually-recorded conversation between Burton and the UCE. Burton and the UCE discussed that Burton's "little friend" (Burton's unknown drug cartel contact) had been talking too much. They agreed that they should keep their business between them and not amongst other associates. Burton stated that he had called his "little friend" (Burton's unknown drug cartel contact) because he had wanted to advise the UCE of the name checks he had run. Burton advised that one of the names provided had a "red flag" (law enforcement hit) because the guy was stopped in Alabama and had a "problem." Burton also believed that "greed was kicking in" (Marco Duron wanted a piece of this particular narcotics operation). Burton asked about "taking care of those guys" (giving Duron a cut of the drug proceeds). The UCE stated they should keep their business between them. Burton advised that he was not able to make contact with the UCE after learning about the names and that was why he had reached out to his "little friend" (Burton's unknown drug cartel contact). The UCE discussed getting "good phones" (safe phones) in place so they can have safe conversations. The UCE explained that nothing would be "moved" (there would not be any loads of narcotics) until after the next meeting. *Id.* at ¶ 25.

8.    On September 2, 2008, there was a consensually-recorded conversation between Burton and the UCE. Burton appeared busy as he answered the phone and asked if he could call the UCE back. The UCE indicated that he/she wanted to travel to Atlanta that week. Burton replied that his "guy" (his law enforcement contact) was still working on "it" (running the list of names through law enforcement contacts). Burton continued that "the guy" (his law enforcement contact) was trying to get it without his "code" (his law enforcement identifier) on it. The UCE requested Burton let him know so that he/she could plan the trip. The UCE stated that "the man" (CW-1) wanted to make a trip to get "things going" (start moving narcotics through Burton in the Atlanta area) and make money.

14

Burton apologized for the "misunderstanding" (for getting nervous and failing to meet the UCE at the hotel on August 11, 2008). The UCE told him that was behind them, that he/she understood and they should move on. Burton said he liked it like that. On September 2, 2008, later that day, there was a consensually-recorded call between Burton and the UCE. Burton told the UCE that he talked to the "guy" (his law enforcement contact) and that he (Burton) was going to meet him the next morning at 9:00 a.m. Burton did not want the UCE to waste a trip to Atlanta. Burton offered to mail the paper to the UCE. The UCE asked that Burton contact him when he had the paper in hand. *Id.* at ¶ 26-28.

9.    On September 3, 2008, during a recorded call, Burton agreed that he would travel to McAllen, Texas on September 18, 2008 to meet face to face with the UCE. The purpose of the meeting was for Burton to explain why he had avoided contact with the UCE and CW-1. In the past, Burton had become nervous about dealing with individuals (to include the UCE) who were new to him. Burton did, in fact, make travel reservations to McAllen, Texas, but upon learning of a national DEA takedown got nervous again and decided not to travel. This takedown occurred in an unrelated case and resulted in the arrest of hundreds of individuals across the country on September 16, 2008, a number of whom were in the Atlanta, Georgia area. *Id.* at ¶ 30.

10.    On October 1, 2008, CW-1 obtained a new cellular telephone number for Burton. There had been no contact between CW-1, the UCE and Burton since the failed attempt to meet in McAllen, Texas on September 18, 2008. On November 5, 2008, however, there was a recorded conversation between Burton, using Target Telephone 1, and CW-1 in the presence of a Spanish-speaking FBI Special Agent. Because CW-1 only speaks Spanish, an FBI Agent posed as an English translator for purposes of aiding the conversation with Burton, who only speaks English. CW-1 called Burton over the Nextel Direct Connect feature on Target Telephone 1. The two exchanged greetings and CW-1 advised Burton that he would have to speak English with his friend. Burton said "ok." Burton said that everything was fine "over here" (in Atlanta), that he was just trying to see when we could come over and see CW-1. The

agent translator replied that CW-1 wanted to know "what's going on" and how could they "could square things away?" Burton stated that everything was fine and that "he was sorry that he missed" CW-1. Burton said he has been waiting on them to get together. Burton said he "didn't like the hotel downtown" (referring to the meeting that was to take place on August 11, 2008 at a hotel in downtown Atlanta). Burton said that he told them "he knew too many people and the guy (the UCE) didn't want to leave the hotel." Burton said, "he didn't have a problem, but the guy was trying to get him to meet at the hotel" (referring to the UCE). The agent translator advised Burton they are not "working with that guy (the UCE) anymore." Burton said, "I'm ready whenever you all are ready (to distribute drugs). I didn't know what was going on. I've been talking to my friend over there (in Mexico) and there's too much confusion." The agent translator asked, "what do you think we should do?" Burton replied, "I don't know. I mean, my thing is, I'm ready to sit down and talk so we can get everything ready to go (begin distributing narcotics)." He continued, "I'm ready to go over here (in Atlanta). Everything's still together (the organization is set up). I sat down (he waited) after I didn't hear from you all." He went on, "I've been sitting down (waiting). I'd rather talk to him (meaning CW-1). Something was not right with him (referring to the UCE). I didn't feel comfortable." The translator then said, "So what can we do, with no more fuck-ups?" Burton said, "I'm ready to get to work (begin distributing drugs), I'm not gonna fuck-up." He went on, "I'm not worried about fucking up. I'm not going to make myself look bad in front of him (CW-1). He continued, "when I know everything's not set up right (making reference to dealing with the UCE), I'm not gonna make myself look bad in front of him (CW-1)." The translator replied, "So you're ready (to begin distributing drugs) then?" Burton said, "yeah everything is ready on my end. I'm ready. It's quiet over here (no law enforcement activity)." Burton went on, "I like the way he's (CW-1) doing it, keeping everything in place over there (in Mexico)." Burton said, "everything is quiet (no law enforcement activity) over here. I'm ready to go, we can move slowly (start distributing slowly)." Burton said, "tell him (CW-1) I'm sorry about all the confusion." Burton reiterated that he had "his friend (drug contact) from over there (Mexico) telling him one thing, this guy (the UCE) telling me something else." The agent translator

ended the call by saying, "That's why they are trying to cut everybody else out and work together." Burton responded, "10-4." Based on her training and experience, the agent opined that, in this call, Burton was trying to explain to CW-1 (whom Burton believed to be a highly-placed Mexican drug cartel member) that he was ready to move drugs for CW-1. When Burton stated that "everything was quiet over here," the agent believed that he meant he is secure that there was not any attention from law enforcement on his narcotics operation in Atlanta. Burton further explained that he was nervous about dealing with an unknown person (the UCE) and when Burton said he "didn't want to look bad" he meant he did not want to interfere with his established association with the drug cartel and his ability to continue distributing drugs for them. Burton explained to CW-1 that he had "everything ready," meaning that his narcotics operation is in place and functioning. In this call, Burton was attempting to repair the relationship with CW-1 so that he could begin to tap into a new supply of cocaine. *Id.* at ¶ 32.

11.   In connection with this investigation, agents confirmed that Target Telephone 1, the telephone used by Burton, was active and analyzed the toll records for Target Telephone 1 from August 17, 2008 through November 13, 2008 (the "Toll Period"). The Direct Connect was first utilized on August 27, 2008 and was still active as of the date of the application. *Id.* at ¶ 33.

12.   Telephone toll records for Target Telephone 1 for the Toll Period indicate that Target Telephone 1 had contacted Mexican direct connect number 52*317954*3 on thirty (30) occasions, with the last contact on October 25, 2008. This Mexican direct connect number was being utilized by an associate (FNU LNU) located in Mexico working with Joe Sanroman. Sanroman was arrested as part of a DEA investigation and who worked in McAllen, Texas, was a transportation leader within the Fabian Molian Mexican drug-trafficking organization. Sanroman participated in the transportation and delivery of 75 kilograms of cocaine to Atlanta in early 2008 and it appeared that the FNU LNU, who uses 52*317954*3, worked directly with him. *Id.* at ¶ 34.

13.   Telephone toll records for Target Telephone 1 for the Toll Period

indicate that Target Telephone 1 had been in contact with Mexican direct connect 62*15*56703 on thirty-three (33) occasions, with the last actual contact on November 7, 2008. Mexican direct connect 62*15*56703, per CW-1, was utilized by Duron. CW-1 has communicated with Duron on this number. Duron, who is indicted in this case, was a drug trafficker working with both the Gulf Coast Drug Cartel and the Zetas in Mexico. Duron directed supplies of cocaine to various distribution points in major cities throughout the United States. *Id.* at ¶ 35.

14. Telephone toll records for Target Telephone 1 for the Toll Period showed that Target Telephone 1 had been in contact with direct connect number 143*491*2453 on nineteen (19) occasions, with the last contact made on November 13, 2008. Pursuant to a DEA investigation in McAllen, Texas, 143*491*2453 was being utilized by Ruben Salinas to facilitate the transportation of narcotics for a drug-trafficking organization. *Id.* at ¶ 36.

15. Target Telephone 1 had numerous contacts with various Mexican telephone numbers. Specifically, for the period August 17 (start of phone) through as recently as November 12, 2008, seven separate Mexican PTT numbers were called by Burton for a total of 103 calls to Mexican PTT numbers. Based upon her training and experience, the agent was aware that Mexico is the source country for importing cocaine, methamphetamine, marijuana, and other illicit narcotics into the United States. The investigation determined that Burton had historically obtained his narcotics from Mexico and, based on the affiant's investigation of Burton, there was no legitimate business that Burton would have in Mexico. Finally, the affiant opined that based on her training and experience that Mexican drug traffickers often rely exclusively on the PTT function on their telephones to communicate because they erroneously believe that it cannot be intercepted. She believed that, during these calls, Burton was coordinating the distribution of narcotics and the collection of drug proceeds.

As noted in previous pleadings, this summary represents only a portion of the evidence described in the 44-page affidavit for the Target Telephone.

Similarly, the inclusion of information relating to the Watkins-Lumsden case would not have precluded the finding of probable cause. *See United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990). The fact that Lumsden purchased the information from a third party would not have defeated the probable cause determination, nor would it have altered the determination, given the other evidence already in the affidavit. The affidavit also disclosed the information was from a third party as well as Lumsden's hope he would receive a sentencing reduction and his prior involvement in a fraud case. Importantly, paragraph 31 was corroborated by pages and pages of information demonstrating Burton had dealt drugs for years and was using the Target Telephone to further this end.

The defendant, however, challenges the affidavit on two grounds. First, without elaboration, he argues that the "information from CW1 was insufficient and wrought with its own problems." The defendant, however, does not cite to evidence in the record that describes those problems. He also does not explain why the meetings and telephone calls with CW1 and Burton in the months immediately before the initiation of the wiretap were problematic.

The meetings showed Burton was pushing to traffic drugs with a person whom

he believed worked for the cartel. Moreover, the meetings demonstrated that Burton had a network in Atlanta to carry out these crimes. Each of the contacts was directly supervised by FBI agents, including an undercover agent. It is unclear how this was problematic.[3]

In a final paragraph, the defendant asserts the information in the affidavit was stale. He argues the last drug deal with Burton was in 2003 and briefly acknowledges the drug-related conversations in August, 2008. The defendant, however, entirely ignores the evidence in the affidavit after that time. It is as though he draws a line at paragraph 25 and reads no further.

He did not discuss the recorded conversation between the undercover agent and Burton on September 2, 2008, in which Burton discussed moving forward with his plans to deal with the cartel. *Id.* at ¶ 26-28. He omitted the call from September 3, 2008, when Burton agreed to meet the undercover agent face-to-face to discuss drug dealing. *Id.* at ¶ 30. He overlooked the October 1st telephone call with the undercover agent, when Burton discussed the aborted drug meeting and their plans to distribute drugs in Atlanta. *Id.* at ¶ 32. There was no mention of the telephone toll

---

[3] The defendant previously requested information on when CW1 was thought to have been murdered in Mexico. In July or August, 2009, FBI agents began to suspect he had been killed by members of the drug cartel, seven months after the initiation of Target Telephone 1.

analysis showing drug activity days before the wiretap was initiated. He argues that the probable cause is stale, yet telephone tolls showed that Burton was in contact with Marcos Duron, the source of the drugs, on the Target Telephone on November 7, 2008, as well as 33 other occasions between August 17 and November 7, 2008. *Id.* at ¶ 35. The wiretap order was signed just days afterward. His argument, therefore, is without support. *United States v. Haimowitz*, 706 F.2d 1549, 1554-55 (11th Cir. 1983)("[I]nformation which demonstrates a chain of related events covering a broad span of time continuing to the current period may furnish a most reliable indicia of present activity, thereby clearly demonstrating that probable cause exists for the order to intrude.")(citing *United States v. Weinrich*, 586 F.2d 481, 491 (5th Cir. 1978)).

The affidavit, therefore, supports a finding of probable cause, even without Lumsden's information. Consequently, the defendant has failed to meet his burden.

### B.    The Agent Affiant Did Not Lie or Recklessly Omit Material Information.

The evidence at the hearing showed that Special Agent Badolato did not lie or recklessly omit information from her affidavit. In his pleading, the defendant focuses on the Watkins investigation, but points to no evidence that she or those working with her on the Burton investigation were aware of it. To prevail in a *Franks* challenge, one must establish (1) that information contained in an affidavit was untrue or

omitted, (2) that inclusion of the untrue or omitted information was either deliberate or in reckless disregard for the truth and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant. *O'Ferrell v. United States*, 253 F.3d 1257, 1267 (11th Cir. 2001). Focusing on the second prong, the defendant, therefore, must show that Special Agent Badolato deliberately or recklessly omitted the information concerning the Watkins-Lumsden investigation from the wiretap affidavit.

At the hearing, however, the defendant produced no evidence to show that Special Agent Badolato was aware of the investigation. In fact, there was significant evidence to the contrary. From her testimony, it was obvious that she had no idea about the allegations relating to Lumsden prior to signing the wiretap affidavit. She testified that she only learned about the Watkins-Lumsden investigation in 2010 after the case had concluded. The defendant, therefore, must show that Special Agent Badolato acted recklessly when she failed to learn of the investigation.

The record shows, however, that Special Agent Badolato was not reckless at all. She never accepted Lumsden's statements at face value, but spent significant time and effort checking to see if Lumsden's information was verifiable. At her request, an analyst reviewed the FBI Indices Database to determine if there were entries relating to Lumsden. In that database, there were entries for Lumsden

showing he had been involved in mortgage fraud or a financial fraud investigation. (T. 19). She checked his criminal history and determined he had been involved in fraud cases. (T. 20). There was no reference in Indices or elsewhere to the Watkins-Lumsden investigation or any related investigations. (*Id.*)

As part of her investigation, she also conducted a public records search that gave Lumsden's background, addresses, property ownership and other public record information. (T. 21.) She then took Lumsden's information and checked it against the FBI and other databases to determine if it was accurate. This research confirmed there were a number of links between the people identified by Lumsden and the Burton investigation. (*Id*). Moreover, Lumsden information was corroborated by the information she had already developed in her own case. Finally, she spoke with an FBI agent that Lumsden had assisted in an intellectual property investigation. (*Id.*) In all of her research, there was no indication of the Watkins-Lumsden investigation.

Special Agent Badolato also informed the District Court, "[b]ased on my investigation, I believe that CW2 is reliable." She did not overstate his credibility or vouch for him without qualification; other than to say that she believed he was reliable based on her research. She described what Lumsden had said and provided the District Court with her opinion on his credibility based on her research; all of which was entirely accurate. Ultimately, Lumsden's information proved to be true.

Burton was distributing significant quantities of drugs as Lumsden described.

In response, the defendant counters "the government is the government" and argues, in essence, that Special Agent Badolato should have known or sensed that an unrelated investigation was underway. Stretching to reach this conclusion, he cites case law that holds agents may rely on other agents' knowledge when developing probable cause. Of course, this line of cases relates to the collective knowledge of agents that are actually working on the same case together and who are communicating about the case. The Watkins-Lumsden investigation was unrelated to the Burton drug investigation and there is no evidence that the agents were working together collaboratively. The analysis would be different if any agent on the drug squad was aware of the Watkins-Lumsden investigation. There is no evidence that they were.

Undaunted, the defendant quotes at length from a district court decision from the District of Massachusetts. *In re Application for Interception of Wire Communications*, 2 F.Supp. 177, 178 (D. Mass. 1998). His quote, however, is selective. Immediately before the portion cited in his brief, the district court stressed

> [t]he Court is mindful of and sensitive to the enormous administrative difficulties involved in ascertaining the existence of potential informants employed by various agencies within the government, as well as the attendant danger both to the informants and to law enforcement personnel. Accordingly, the demands made by the Court are not

24

> designed to exhaust every avenue of inquiry or eliminate every
> possibility of error. It is enough that the government agent who applies
> for the order has made 'a reasonable, good faith effort to run the gamut
> of normal investigative procedures before resorting to means so
> intrusive as electronic interception of telephone calls.'

*Id.*    The district court then noted that the First Circuit Court of Appeals had

specifically declined to suppress electronic surveillance evidence because of

undislcosed information known to the government as a whole, but unknown to the

individual affiant. *Id.* (citing *United States v. Mastroianni*, 749 F.2d 900, 909 (1ˢᵗ Cir.

1984)).

The defendant also cites a Ninth Circuit case in support of his position. *United*

*States v. Aviles*, 868 F.2d 1108, 1111 (9th Cir.1989).  In *Aviles*, the FBI and DEA

were jointly engaged in a narcotics investigation.  A subsequent motion to suppress

evidence alleged the government had violated the wiretap statute by failing to

disclose in the affidavit submitted by an FBI agent information that a participating

DEA agent had withheld from him.  Like the Massachusetts case, the agents in *Aviles*

were working together and participating in the very same investigation.  *Id.*

Here, the agents were not working on the same case, a related case or even on

the same squad.  ATF agent Beck did not even work for the same agency.  Contrary

to the defendant's assertion, these cases do not support his argument that one agent's

knowledge of an investigation should be imputed to another agent in an unrelated

investigation.

Indeed, once the knowledge of one agent is imputed to all agents, they are essentially responsible for knowing every fact of every case without regard for time, geography or even agency. In this construct, FBI, for example, would be responsible for knowing the details of all other unrelated federal cases, despite an agent having had nothing to do with the unrelated case. The cases cited by the defendant do not even go this far. Under *Brady* and its progeny, the obligation to disclose exculpatory information relates only to the prosecution team itself. *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2001)("We have held that a claimant must show that the favorable evidence was possessed by a district's prosecution team, which includes both investigative and prosecutorial personnel.") It would be anomalous to construe this obligation more broadly in the context of a wiretap affidavit, but nowhere else.

In *United States v. Haimowitz*, the Eleventh Circuit actually dealt with a case where the warrant affidavit did not disclose that the informant had been convicted of felonies and engaged in "numerous bad acts." 706 F.2d 1549, 1556 (11th Cir. 1983). Based on this omission, the defendant alleged there was a *Franks* violation. The court held that even if the magistrate had known of the informant's bad acts, the affidavit still would have supported a finding of probable cause. *Id.* It noted that the informant's information was corroborated with other evidence in the affidavit as well

as firsthand observations. *Id.* Like *Haimowitz*, the Lumsden information was corroborated by overwhelming evidence presented in the affidavit. *See also United States v. Phillips*, 327 Fed. Appx. 855, 859 (11th Cir. 2009)(holding omissions for the affidavit were not fatal to a finding of probable cause.).

Finally, the defendant argues that Special Agent Badolato did not properly identify for the district court that the Lumsden information came from another person. He takes issue with the way the affidavit is written. Def. Motion at p. 29 (She "should have written 'from these contacts, CW2 learned the following."). The defendant's argument, however, misses the mark. He has produced no evidence that Special Agent Badolato intended to deceive the District Court with the wording of the affidavit or that she was reckless, as is his burden. Here, again, the evidence is contrary.

The agent, in fact, summarized the information provided by Lumsden to law enforcement and explicitly noted in the first part of the paragraph that Lumsden's information came from people that Lumsden knew. The affidavit stated that "CW2 knows several individuals who are close to BURTON, including people that know BURTON personally and others who work for BURTON's drug-trafficking organization. Through these contacts, CW2 knows . . ." Although the defendant again paints this as part of an effort to mislead the District Court, there is nothing in

27

the record to suggest the agent intended to deceive anyone and, in fact, there is no evidence the District Court was misled at all by the wording.

Of course, the defendant now picks at threads and, at length, critiques the way the affidavit is written, but this is not a *Franks* violation. *Maryland v. Garrison*, 480 U.S. 79, 87 (1987)(recognizing the "need to allow some latitude for honest mistakes that are made by officers in dangerous and difficult process of making arrests and executing search warrants.")  At one point in his argument, the defendant even points to a typographical error made by the agent as support for a *Franks* violation, although he admits it was "independently minor."  Def. Mot. at p. 35.

Importantly, Lumsden's information, as described by Special Agent Badolato, is an accurate summary of what he told agents during the two debriefings.  As we now know, Burton was actually distributing drugs as Lumsden described. Ultimately, there was no conspiracy to mislead the court or reckless indifference for the truth. Instead, the evidence shows that Special Agent Badolato did provide an accurate summary of the evidence she learned during the course of her investigation and accurately noted the source of Lumsden's information.  The defendant's argument, therefore, is without merit.

28

## III.   <u>CONCLUSION</u>

For these reasons, the Court should deny the defendant's motion to suppress the wiretap in this case.

Respectfully submitted this the 21st day of March, 2010.

Respectfully submitted,
SALLY QUILLIAN YATES
UNITED STATES ATTORNEY


KURT R. ERSKINE
ASSISTANT  UNITED STATES  ATTORNEY
600 Richard B. Russell Building
75 Spring Street
Atlanta Georgia 30303
Office: 404/581-6000
Georgia Bar No. 249953

29

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by electronic case filing:

Counsel of record.

This 21st day of March, 2010.

_____
KURT R. ERSKINE
ASSISTANT UNITED STATES ATTORNEY