IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,     )
         )
v.         )     Criminal Action No.
         )     1:09-CR-482-TWT-LTW
IVEY GRANT,     )
         )
     DEFENDANT.     )
_____ )

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

This case is presently before the Court on Defendant's Motion to Suppress Statements made by Defendant while in police custody after his arrest and Defendant's Motion to Suppress all Conversation and Evidence Seized Pursuant to Court Ordered Electronic Interceptions.  Docket Entries [81, 130].  For the reasons outlined below, this Court **RECOMMENDS** that both Motions be **DENIED**.  Docket Entries [81, 130].

## DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

### I.  FACTUAL BACKGROUND

On December 8, 2009, a federal Grand Jury residing in the Northern District of Georgia returned a superseding indictment alleging that Defendant Ivey Grant ("Defendant") knowingly conspired to possess with the intent to distribute, at least five kilograms of cocaine, a Schedule II controlled substance, and at least 100 kilograms of

marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 841 (b)(1)(A)(ii), (b)(1)(B)(vii) (2006 & Supp. II 2008), and 21 U.S.C. § 846 (2006). Docket Entry [35]. A warrant for Defendant's arrest was issued the following day, and six task force agents, some dressed in plain clothes, others in clothing identifying them as the Federal Bureau of Investigation ("FBI") or police, arrested Defendant. (Transcript of February 18, 2010, Suppression Hearing, Docket Entry [118], hereinafter "Tr.," 6-8). The agents had their weapons drawn when Defendant was arrested in the parking lot of a Sonic Drive-in Restaurant in Conyers, Georgia. (Tr. 6-8). The agents caught Defendant by surprise, announced that they were FBI agents, and requested that Defendant step out of his truck, while showing his hands. (Tr. 8-9). Subsequently, the agents cuffed Defendant's hands behind his back, searched him, and placed him in the back of a FBI vehicle. (Tr. 9). Approximately five minutes later, FBI Special Agent Raphael Jimenez ("SA Jimenez") spoke to Defendant and explained that he was under arrest for narcotics charges, and that he would be taken to the FBI's local office shortly. (Tr. 10). Approximately ten minutes after Defendant's arrest, SA Jimenez and FBI Special Agent Ronald Campbell ("SA Campbell") drove Defendant to the FBI's office in northeast Atlanta. (Tr. 11). SA Campbell sat in the backseat with Defendant. (Tr. 11). The drive to the FBI's office took approximately thirty-five to forty minutes. (Tr.

AO 72A
(Rev.8/82)

18).

### A.   SA Campbell Explained Defendant's Miranda Rights To Him

While sitting next to Defendant, SA Campbell held an "advice of rights" form where Defendant could read it, and began to explain line by line Defendant's rights under the Fifth Amendment of the United States Constitution and Miranda v. Arizona, 384 U.S. 436 (1966).  (Tr. 11-12).  The form is split into two sections: (1) a listing of Miranda rights and (2) a waiver of the rights. (Gov't's Ex. 1).  Among the rights listed on the form is the right to talk to an attorney for advice before questioning, the right to remain silent, and the right to have an attorney present during questioning.  Id.  The waiver form also states, "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish."  (Gov't's Ex. 1).  The waiver portion of the form reads: "I have read this statement of my rights and I understand what my rights are.  At this time I am willing to answer questions without a lawyer present."  Id.  During this exchange, SA Campbell explained in detail that if Defendant could not afford a lawyer when arrested, the Government would appoint one on his behalf.  (Tr. 14-15).   The agents explained to Defendant that if Defendant wanted to talk to a lawyer before he spoke to them, he could do so, that Defendant did not have to talk to them, or that Defendant could wait to talk to a lawyer and then talk to them.  (Tr. 15).  After SA

AO 72A
(Rev.8/82)

Campbell read Defendant his rights, SA Campbell placed the advice of rights form in Defendant's lap where he could review the form.  (Tr. 13).  Defendant, who attended high school and  "some college," reviewed the form for approximately two or three minutes. (Tr. 14).  SA Campbell asked Defendant whether he understood his rights, and Defendant responded, "Yes, but I can't afford a lawyer."  (Tr. 14).  During the conversation with Defendant, no weapons were displayed, no threatening gestures were made, and no threats or promises were made by the agents.  (Tr. 16).

### B.   Defendant Repeatedly States That He Cannot Afford A Lawyer

The FBI agents' and Defendant's versions of events differ.  SA Jimenez testified that after Defendant indicated that he could not afford a lawyer, SA Campbell explained in detail that if he could not afford a lawyer, the government would appoint one and pay one to represent him.  (Tr. 15).  At the end of the explanation, the agents asked Defendant if he understood again, and Defendant replied, "Yes, . . . but I can't afford a lawyer."  (Tr. 15).

Defendant, however, testified that his response to SA Campbell was, "I need an attorney.  I know I can't afford one."  (Tr. 30, 33).  Defendant testified that in response, one agent told him that one could be appointed and the other told him "to look over the papers."  (Tr. 32, 37).  Although Defendant acknowledges that the agents told him that

4

the courts would appoint him an attorney, he also maintains that "no courts [were] in the room." (Tr. 34).

SA Jimenez testified that they were being as clear as possible and that it seemed like Defendant "understood everything [they] explained to him, and once [they] thought [Defendant] got it, he would just go back to saying 'I can't afford a lawyer for this.'" (Tr. 16). The agents explained that if Defendant wanted to talk to a lawyer before he talked to them, he could talk to a lawyer and then talk to them and that it was up to Defendant. (Tr. 15). Special Agents Jimenez and Campbell testified that although Defendant said that he understood his rights several times, Defendant repeated "I can't afford a lawyer" possibly ten times en route to the FBI office. (Tr. 14-15, 24-25, 28). Each time Defendant told the agents he could not afford a lawyer, the agents would again explain the process of having an attorney appointed. (Tr. 14-15, 24-25, 28). The agents also testified that eventually Defendant said that he could not afford a lawyer so many times that they ceased trying to explain the process. (Tr. 26, 47). Thereafter, the agents did not ask Defendant any more questions while they were in transit. (Tr. 47). According to Special Agents Jimenez and Campbell, Defendant never stated that he needed a lawyer, asked for a lawyer to be present, or indicated that he needed to call a lawyer. (Tr. 28-29, 41-43).

5

Defendant insists that he repeatedly told Special Agents Jimenez and Campbell that he needed an attorney and that he knew he could not afford one; he testified that each request for an attorney was met with either an explanation of his rights, an explanation of the process of having an attorney appointed for him, or further questions from the agents.  (Tr. 32, 34-38).

### C.    Agents Campbell And Smith Interview Defendant At The FBI's Office

Upon arrival at the FBI's office, Defendant's handcuffs were removed and he was fingerprinted, photographed, and placed in an interrogation room with Campbell and Agent David Smith.  (Tr. 17, 20).  After approximately 20 minutes, the agents  showed Defendant the advice of rights form again and each of his rights were explained again. (Tr. 17, 19).  Defendant refused to sign the waiver portion of the advice of rights form, but, according to SA Jimenez, did not request a lawyer.  (Tr. 17, 21, 24).  SA Jimenez was not present in the interrogation room when this happened, but based his testimony of what happened in the interrogation room from the report prepared by SA Campbell and other agents, and through information gained from conversing with other agents. (Tr. 27, 28-29).

Defendant testified that he refused to sign this form because he told the agents that he needed a lawyer.  (Tr. 31).  When asked whether he requested an attorney directly

6

before he was interviewed in the interrogation room, Defendant testified, "I kept saying I need an attorney. I didn't say for that particular minute." (Tr. 35). The agents never procured an attorney for Defendant. (Tr. 38).

Subsequently, a recorded conversation between Defendant and another co-defendant was played for Defendant. (Tr. 18). SA Jimenez testified that at the end of the recording, Defendant said, "Sounds like me." At some point, the agents asked Defendant why he would be going to the shop in the middle of the night and Defendant answered that he has customers that come in at all times of the night, and that whenever these customers called, he would go to work to handle what was needed whenever it was needed. (Tr. 18, 24, 49). SA Jimenez testified that Defendant further volunteered that there were a "bunch of tractor trailers and vehicles on [his] property," but that he did not know what was inside them. (Tr. 18). SA Jimenez further testified that at that point, Defendant stated that he did not want to talk anymore, and the interview ended. (Tr. 18, 48-49). The entire interview was completed in approximately one hour and a half. (Tr. 19). The exchange between Defendant and the agents was polite. (Tr. 16). There were no threatening gestures made or any promises offered to Defendant on the part of the agents. Id.

7

## II.   **LEGAL ANALYSIS**

Defendant argues that he invoked his right to counsel under the Fifth and Sixth Amendments when he stated that he needed an attorney while in transport to the FBI office, when he stated that he wanted an attorney again in the interrogation room, and when he refused to sign the waiver of rights form.  Defendant also argues that he did not knowingly and voluntarily waive his rights, as he did not understand the practical application of those rights.  The Government argues that Defendant never invoked his right to counsel because he never unambiguously stated that he needed an attorney, only that he could not afford one.  Also, the Government argues that Defendant confirmed his understanding of his <u>Miranda</u> rights, and that his statements were not involuntary.  Finally, the Government argues that Defendant's refusal to sign a waiver of rights form was not an invocation of either his right to remain silent or the right to counsel.

### A.   **Defendant Did Not Invoke His Right To Counsel**

Defendant did not invoke his right to counsel under the Fifth or the Sixth Amendments.  The purpose of the Sixth Amendment counsel guarantee–and hence, the purpose of invoking it– is to protect the unaided laymen at critical confrontations with his expert adversary, the government, after the adverse positions of the government and the defendant have solidified with respect to a particular crime.  <u>McNeil v. Wisconsin,</u>

AO 72A
(Rev.8/82)

501 U.S. 171, 177-78 (1991).  The Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Fellers v. United States, 540 U.S. 519, 523 (2004); Patterson v. Illinois, 487 U.S. 285, 290 (1988) ("There can be no doubt that petitioner had the right to have the assistance of counsel at his postindictment interviews with law enforcement authorities.").  In this case, Defendant's Sixth Amendment right to counsel had attached because he had been indicted prior to being arrested by the agents.  Patterson, 487 U.S. at 290.

The accused "is denied the basic protections of the Sixth Amendment when there is used against him at his trial evidence of his own incriminating words, which federal agents deliberately elicited from him after he had been indicted and in the absence of his counsel." Fellers, 540 U.S. at 523 (citing Massiah v. United States, 377 U.S. 201, 206 (1964)).  A Sixth Amendment violation occurs when (1) government agents (2) deliberately elicit incriminating statements from an indicted accused outside the presence of his counsel, and (3) in the absence of any waiver of his Sixth Amendment rights. United States v. Richitelli, No. 10-12078, 2011 WL 334668, at *5 (11th Cir. Feb. 3, 2011) (citing Fellers, 540 U.S. at 523-25).

The Sixth Amendment does not bar postindictment questioning in the absence of

9

counsel if a defendant waives the right to counsel.  Patterson, 487 U.S. at 291.  The

Supreme Court in Patterson v. United States, 487 U.S. 285, 290-91 (1988), explained:

> The fact that petitioner's Sixth Amendment right came into existence with
> his indictment, i.e., that he had such a right at the time of his questioning,
> does not distinguish him from the preindictment interrogatee whose right to
> counsel is in existence and available for his exercise while he is questioned.
> Had petitioner indicated he wanted the assistance of counsel, the authorities'
> interview with him would have stopped and further questioning would have
> been forbidden.

Id. at 290-91.  The accused may waive his Sixth Amendment right to counsel if his

waiver is knowing, intelligent, and voluntary.  Montejo v. Louisiana, 129 S. Ct. 2079,

2085 (2009).  "The defendant may waive the right whether or not he is already

represented by counsel; the decision to waive need not itself be counseled."  Montejo,

129 S. Ct. at 2085.  "As a general matter . . . an accused who is admonished with . . .

[Miranda warnings] has been sufficiently apprised of the nature of his Sixth Amendment

rights, and of the consequences of abandoning those rights, so that his waiver on this

basis will be considered a knowing and intelligent one."  Patterson, 487 U.S. at 296; see

also Gore v. Sec'y for Dep't of Corrs., 492 F.3d 1273, 1302-03 (11th Cir. 2007) (noting

that if "the accused is not represented and has not requested counsel, and advisement of

Miranda rights is sufficient to safeguard the Sixth Amendment right, . . . [then] any

statement given following such advice of rights will be presumed to be the product of a

10

voluntary waiver"); United States v. Gonzalez-Lauzan, Jr., 437 F.3d 1128, 1140 (11th Cir. 2006). "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law. Patterson, 487 U.S. at 297 (citing Moran v. Burbine, 487 U.S. 412, 422-23 (1986)). Once a criminal defendant does invoke his Sixth Amendment right to counsel, a subsequent waiver of that right, even if it is knowing, intelligent, and voluntary, is presumed invalid if it is secured pursuant to police-initiated conversation. United States v. Tran, 171 F. App'x 758, 760 (11th Cir. 2006) (citing Michigan v. Harvey, 494 U.S. 344, 345 (1990)).

In contrast, the Fifth Amendment of the United States Constitution prevents a person from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As explained in Miranda v. Arizona, 384 U.S. 436 (1966), the Fifth Amendment guarantees that a suspect subject to custodial interrogation has the right to consult with an attorney and have counsel present during questioning and that the police must explain this right to the suspect before questioning begins. Id. at 474. The Fifth Amendment right to counsel as established in Miranda was "one of a series of recommended procedural safeguards that were not themselves rights protected by the

Constitution but were instead measures to insure that the right to self-incrimination was protected." Davis v. United States, 512 U.S. 452, 457 (1994). The Fifth Amendment right to counsel is also protected by the knowing, intelligent, and voluntary waiver standard. Davis, 512 U.S. at 458; see also Maryland v. Shatzer, 130 S. Ct. 1213, 1219 (2010) (citing Miranda, 384 U.S. at 475). "If the suspect waives his right to counsel after receiving Miranda warnings, law enforcement officers are free to question him." Davis, 512 U.S. at 458. Additionally, under the Fifth Amendment, once the defendant invokes his right to counsel, police questioning must cease. Montejo, 129 S. Ct. at 2081; Davis, 512 U.S. at 458. "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police initiated custodial interrogation even if he has been advised of his rights." Edwards v. Arizona, 451 U.S. 477, 484 (1981).

    1.   Defendant did not Invoke his Right to Counsel when he Repeatedly Stated that he Could not Afford an Attorney

In this case, Defendant argues that the agents had a duty to stop interrogating him because he invoked his right to counsel pursuant to the Fifth and Sixth Amendments when he repeatedly stated that he could not afford a lawyer. The Supreme Court has analyzed whether in the Fifth Amendment context, a defendant's less than clear and

explicit statements about counsel can be considered to be an invocation of the right to counsel.

When analyzing whether an accused has waived his right to counsel under the Fifth Amendment, the Supreme Court has determined "[i]f an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her Miranda rights." Berghuis v. Thompkins, 130 S. Ct. 2250, 2259 (2010) (citation omitted). For instance in Davis v. United States, 512 U.S. 452 (1994), the defendant waived both his right to remain silent and to counsel, orally and in writing. Id. at 454-55. Approximately one hour and a half into the interview, the defendant stated, "Maybe I should talk to a lawyer." Id. The agents stopped the interview and clarified the defendant's request, to which the defendant replied that he was not requesting a lawyer. Id. The interview then continued on for another hour until petitioner said, "I think I want a lawyer before I say anything else." Id. The Supreme Court concluded that the defendant had not invoked his Fifth Amendment right to counsel. It reasoned that "[i]nvocation of the Miranda right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Id. at 459. If a suspect only

13

makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, the cessation of questioning is not required. Davis, 512 U.S. at 459 (emphasis added). The Supreme Court explained:

> Although a suspect need not speak with the distinction of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect.

Davis, 512 U.S. at 459 (citation omitted). The Supreme Court also declined to adopt a rule requiring officers to ask clarifying questions.[1] Davis, 512 U.S. at 461-62.

In Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994), the Eleventh Circuit rejected a similar ambiguous request implicating the Fifth Amendment right to counsel. Id. There, Coleman was arrested, read his Miranda rights, and then confessed the killing

---

[1] Previously, the Eleventh Circuit held that when a defendant makes an equivocal request for an attorney during a custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only: clarifying that request for counsel until it is clear. Coleman v. Singletary, 30 F.3d 1420, 1423-24 (11th Cir. 1994) (citing Owen v. Alabama, 849 F.2d 536, 539 (11th Cir. 1988)). However, the Eleventh Circuit held that Davis v. United States, 512 U.S. 452 (1994), was a supervening decision which changed the clarification rule, no longer requiring that officers ask clarifying questions when a suspect makes an equivocal or ambiguous request for counsel. Coleman, 30 F.3d at 1423-24.

14

of his sister to police investigators.  Id. at 1422.   The investigators then turned on a tape recorder to record the confession, and read Coleman his Miranda rights again, which he waived for a second time.  Id.   The interrogation was interrupted by a phone call from a public defender and the investigators turned off the tape recorder and informed Coleman that the attorney asked them to "cease any further interview at this time."  Id. The public defender then contacted an Assistant State Attorney and expressed that she intended to instruct Coleman not to answer any more questions, but this message never made it Coleman and the public defender never made it to the station.  Id.

The investigators resumed the interrogation, and shortly after doing so, Coleman inquired about the public defender.  Id.  When asked directly whether he wanted to have the assistance of a public defender or proceed with the interrogation, Coleman replied, "I don't know.  But if he said to stop it I don't want to do what he said not to do."  Id. at 1423.  The investigators reiterated to Coleman that he did not have to talk to them if he did not want to, and told Coleman that he could stop any time that he wanted to stop. Id.  Coleman replied, "I guess if that guy thinks its all right, I don't care."  Id.  The Coleman court found that Coleman's statement was equivocal, as it was capable of having "equally plausible, differing interpretations," and that the interrogators had no duty to cease questioning Coleman because his statement was not clear.  Id. at 1425-26.

15

As a preliminary matter, it is proper to rely on the reasoning of <u>Davis</u> and <u>Coleman</u> when analyzing whether Defendant has invoked his right to counsel under both the Fifth and Sixth Amendments.  Although the Supreme Court has signaled that the Fifth Amendment and Sixth Amendment rights to counsel will not always be analyzed in precisely the same manner, the Supreme Court has not yet had the opportunity to decide how it will analyze ambiguous statements concerning the representation of counsel pursuant to the Sixth Amendment. <u>See, e.g.,</u> <u>Patterson</u>, 487 U.S. at 297 n.9 (noting that the "Sixth Amendment's protection of the attorney-client relationship - the right to rely on counsel as a medium between the accused and the state - extends beyond Miranda's protection of the Fifth Amendment right to counsel").  This Court has not located any authority indicating that the reasoning in <u>Davis</u>, *supra*, would not apply to ambiguous statements concerning counsel pursuant to the Sixth Amendment.  Thus far, the two rights have been analyzed similarly.  The Supreme Court held in <u>Patterson</u>, *supra*, that the fact that the defendant's Sixth Amendment right to counsel in that case arose with his indictment did not mean that law enforcement officers could not attempt to question him, but just as in the Fifth Amendment context, if the defendant indicated that he wanted the assistance of counsel, the law enforcement officers must cease their questioning.  <u>Patterson</u>, 487 U.S. at 291.  Moreover, the Supreme Court has explained

16

that the knowing, intelligent and voluntary standard for determining whether a waiver of rights occurred is utilized in both the Fifth and Sixth Amendment contexts. <u>Berghuis</u>, 130 S. Ct. at 2260-61 (2010); <u>Patterson</u>, 487 U.S. at 292, 296-97, 300.  Furthermore, the Eleventh Circuit has already applied the analysis of <u>Davis</u> to conclude that a defendant's ambiguous request for the police to allow him to retrieve his bankruptcy lawyer's business card did not invoke his right to counsel pursuant to the Sixth Amendment. <u>Tran</u>, 171 F. App'x at 760-61.  Therefore, if the Defendant articulated his desire to have counsel present sufficiently clearly such that a reasonable law enforcement officer in the circumstances would understand the statement to be a request for an attorney, the agents were required to cease their questioning pursuant to both the Fifth and Sixth Amendments. <u>Davis</u>, 512 U.S. at 459.  If the Defendant's statement fails to meet the requisite level of clarity, the agents were not required to stop their questioning.  <u>Id.</u>

In this case, Defendant did not articulate a request for counsel with sufficient clarity such that the agents should have reasonably understood his statements to be a request for counsel.  First, the Court finds SA Jimenez and SA Campbell's statements that Defendant never requested counsel but instead repeated that he could not afford a lawyer to be more credible because it is more consistent with portions of both parties' factual accounts which are undisputed.  (Tr. 20, 25, 28, 42-43, 49).  The agents'

AO 72A
(Rev.8/82)

testimony is consistent with both Defendant's and the Government's assertion that the agents repeatedly explained the process of having a lawyer appointed for Defendant, after Defendant told them that he could not afford a lawyer.  (Tr. 14-15, 24-25,  32, 34-38, 42-43).  It is clear that the agents did not understand Defendant's statement about not affording a lawyer to be a request for a lawyer because they went to great lengths to explain the process of appointing a lawyer to Defendant several times after Defendant's declaration.  If the agents intended to disregard Defendant's right to counsel, they would not have continually attempted to explain the process. Id.  Additionally, this Court cannot conclude that Defendant's statements "I can't afford a lawyer" were clear requests for counsel.  Other courts which have examined similar statements have concluded that they were not clear requests for counsel because such statements do not indicate a clear desire to deal with the agents only through counsel or a present desire to speak with counsel.  United States v. Sierra-Estrada, 248 F. App'x 973, 981-82 (10th Cir. 2007) (holding that defendant who asked "wonder if I could have access to a lawyer?" and asked "Is it possible if I don't have money?" did not unambiguously request counsel because his statement lacked an indication of the present desire to speak with counsel); Lord v. Duckworth, 29 F.3d 1216, 1220 (7th Cir. 1994) (concluding that defendant's statement "I can't afford a lawyer but is there anyway I can get one?" was not a clear

request for counsel because it lacked the clear implication of a present desire to consult with counsel); <u>United States v. Cruz</u>, 22 F.3d 96, 97 (5th Cir. 1994) (holding that a suspect's statement that he was a "working man" who "couldn't afford an attorney" was not a clear request because it did not evince a desire to deal with the police only through counsel); <u>see also</u> <u>United States v. Whitmore</u>, 386 F. App'x 464, 470 (5th Cir. 2010) (holding that Defendant did not unambiguously invoke his right to counsel when he asked "how he could go about getting a court appointed attorney"); <u>Soffar v. Cockrell</u>, 300 F.3d 588, 595 (5th Cir. 2002) (holding that suspect did not unequivocally invoke his right to counsel when he asked officer whether he should get an attorney, how he could get one, and how long it would take to have an attorney appointed). Likewise, in this case, Defendant did not clearly indicate a present desire to consult with counsel, only that he could not afford one. Although the agents explained that an attorney could be appointed, Defendant still did not request counsel. As the <u>Davis</u> court observed, although it would be prudent police practice for interrogating officers to clarify whether an accused would like an attorney when an ambiguous statement regarding counsel is made, they are not required do so. <u>Davis</u>, 512 U.S. 461. This Court therefore concludes that Defendant did not invoke his right to counsel.

        2.    <u>Defendant's Refusal to Sign a Written Waiver of Rights Form did</u>

<u>not Show Defendant was Choosing to Exercise his Rights</u>

Defendant argues that he invoked his rights again when he refused to sign the written waiver form presented to him for signature in the FBI interrogation room.  The Government, however, is not required to show that a waiver of <u>Miranda</u> rights was express.  <u>Berghuis</u>, 130 S. Ct. at 2261.  The Supreme Court recently explained in <u>Berghuis v. Thompkins</u>, 130 S. Ct. 2250 (2010), <u>Miranda</u> "does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights.  As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afforded."  <u>Berghuis</u>, 130 S. Ct. at 2262. Furthermore, it is well-settled law that a refusal to sign a waiver form is not equivalent to an invocation of rights which would render subsequent questioning improper.  <u>United States v. Boon San Chong</u>, 829 F.2d 1572, 1574 (11th Cir. 1987); <u>see also Berghuis</u>, 130 S. Ct. at 2261-62 (finding that even when a defendant refuses to sign a waiver of rights form, where the defendant understood his <u>Miranda</u> rights, his uncoerced statement may establish an implied waiver of rights).

For instance, in <u>Boon San Chong</u>, Chong, who spoke little English, was informed of his <u>Miranda</u> rights in both English and Chinese.  <u>Chong</u>, 829 F.2d at 1573.  After

20

reading a waiver form that was printed in Chinese, Chong stated that he understood his rights but refused to sign the waiver portion of the form.  Id.  The court concluded that Chong's refusal to sign a waiver form was not an invocation of his Miranda rights.  Id. "A refusal to sign a waiver may indicate nothing more than a reluctance to put pen to paper under the circumstance of custody." Id. (quoting United States v. McDaniel, 463 F.2d 129, 135 (5th Cir. 1972)).  Indeed, the court there concluded that  Chong's actions implied that he intended to waive his rights because he willingly elected to answer questions shortly after reading the Advice of Rights form.  Chong, 829 F.2d at 1574.

As in Chong, here, Defendant's actions implied that he was waiving his rights. It is undisputed that Defendant, who has completed some college level work, read his Miranda rights, was advised by the agents on multiple occasions that they could get an attorney for him, and understood that an attorney could be appointed for him. (Tr. 14-15, 33, 36, 38).  Moreover, Defendant's election to respond to the questioning in the interview room demonstrates an implied waiver of his rights. Id.

Defendant argues that there is no credible testimony as to the actions or words of Defendant after he refused to sign the waiver except Defendant's testimony that when he refused to sign the waiver, he also stated that he wanted an attorney.  This Court, however, finds that SA Campbell's testimony that Defendant never said he wanted the

21

assistance of counsel while in the booking or interview rooms of the FBI office to be credible.  (Tr. 41-43, 49).  Additionally, consistent with the notion that Defendant understood his right to remain silent, Defendant stopped responding to questions when he decided he no longer wanted to respond to them.  (Tr. 49).

###    B.    Defendant Understood His Miranda Rights And Voluntarily, Knowingly, And Intelligently Waived Them

A defendant may waive his Miranda rights or his Sixth Amendment right to counsel provided that the waiver is made voluntarily, knowingly, and intelligently. Berghuis, 130 S. Ct. at 2268 (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)); Patterson, 487 U.S. at 292, 296-97, 300.  The inquiry as to whether a waiver occurred has two parts: the waiver must have been voluntary in the sense that it was the product of free will rather than deception, coercion, or intimidation.  Berghuis, 130 S. Ct. at 2260.  "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Berghuis, 130 S. Ct. at 2260-61; Patterson, 487 U.S. at 292, 296-97, 300.  The "totality of the circumstances surrounding the interrogation" must show that the defendant made an uncoerced choice and understood his rights to conclude that they were properly waived.  Moran, 475 U.S. at 421. The totality of the circumstances test takes into

22

consideration "both the characteristics of the accused and the details of the interrogation" to determine whether police conduct was causally related to the confession. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>see also</u> <u>Haynes v. Washington</u>, 373 U.S. 503, 513 (1963); <u>Reck v. Pate</u>, 367 U.S. 433, 440 (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account."). The court reviews numerous factors under this analysis, including the accused's intelligence, education, age, drug and alcohol use, psychological problems, and prior experience with the criminal justice system, as well as the length of the detention, the nature of the interrogation, the application of physical force or the threat thereof, and the use of a promise or inducement by police. <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1252-1523 (11th Cir. 2003) (citing <u>United States v. Garcia</u>, 890 F.2d 355, 360 (11th Cir. 1989)).

This Court finds that Defendant knowingly, intelligently, and voluntarily waived his right to counsel and to remain silent and freely made statements to the agents. Defendant's waiver was knowing and intelligent because Defendant was read his constitutional rights, at least once, line by line, before he made any statements, and Defendant twice expressed to the agents that he understood his rights. (Tr. 13-16, 42-43). Defendant's argument that he did not understand the practical applications of his <u>Miranda</u> rights is unpersuasive. The agents repeatedly explained Defendant's <u>Miranda</u>

23

rights to him and Defendant repeatedly stated that he understood them.  Given that

Defendant has completed some college course work and seemed reasonably intelligent

during his testimony at the suppression hearing, this Court does not find it credible that

Defendant did not understand his rights. (Tr. 14).  Although Defendant testified that the

agents did not tell him that he could obtain the assistance of an attorney free of charge,

the waiver form Defendant read clearly specifies that he had the right to have a lawyer

present during questioning and that if he could not afford one, one could be appointed

for him prior to questioning.  (Gov't Ex. 1).   Moreover, SA Jimenez explained to

Defendant that the Government would pay for a lawyer for him.  (Tr. 15).  Defendant

also admits that the agents advised him on multiple occasions that they could get an

attorney for him, and that he understood that an attorney could be appointed for him.

(Tr. 14-15, 33, 36, 38).  Indeed, this Court's impression of Defendant at the suppression

hearing was that he was not so malleable that he would waive his rights if he did not

understand them.  Rather, if Defendant did not understand a question, he refused to

answer and sought clarification on more than one occasion.  (Tr. 37-38).  While this

Court recognizes that counsel was present with Defendant at the hearing, Defendant did

testify by himself, and he clearly avoided answering any questions that he did not

comprehend. (Tr. 37-38).  Under these circumstances, this Court does not find it credible

24

that Defendant did not understand that he had the right to counsel during questioning and that counsel could be appointed for him free of charge.

Defendant's statements were voluntary because they were the product of a free and deliberate choice. The conduct of the FBI agents was not intimidating; the exchange between Defendant and the agents was polite, and there were no weapons displayed, threatening gestures made, or promises offered by either of the agents. (Tr. 16, 39). Defendant agrees that the agents did not threaten or intimidate him in any way. (Tr. 39). The record also reflects that the entire encounter totaled only approximately one hour and a half in length. (Tr. 19); see Bustamonte, 412 U.S. at 226; (citing Ashcraft v. Tennessee, 322 U.S. 143 (1944) (finding that defendant did not voluntarily waive rights when he answered questions after being taken into custody at seven o'clock on a Saturday evening and questioned until six o'clock the following Monday morning by a series of officers taking turns while the defendant was not allowed to sleep or leave the room)). Because Defendant did not invoke his right to counsel and because he knowingly, intelligently, and voluntarily waived his right to counsel and freely made statements at the FBI office, Defendant's Motion to Suppress Statements should be **DENIED**. Docket Entry [81].

## MOTION TO SUPPRESS ALL CONVERSATIONS AND EVIDENCE SEIZED

25

**PURSUANT TO COURT ORDERED ELECTRONIC INTERCEPTIONS**

In Defendant's Motion to Suppress all Conversation and Evidence Seized Pursuant to Court Ordered Electronic Interceptions, Defendant seeks to suppress evidence of conversations seized from Target Telephone Number 1 ("TT1").[2] Docket Entry [130]. Therein, Defendant argues that the evidence from the intercepted telephone conversations should be suppressed because the agent submitting the affidavit in support of the search warrant recklessly disregarded the truth when she based her affidavit, in part, on an unreliable cooperating witness. Defendant contends that the agent should have known that the cooperating witness was unreliable because other agents from the FBI and several Assistant United States Attorneys from the Northern District of Georgia knew that the cooperating witness actually purchased information relied upon in the warrant from Marcus Watkins, an inmate at the Atlanta City Detention Center. The source of the information was actually Watkins' cousin. Finally, Defendant contends that if the unreliable information is excised from the warrant affidavit, the remainder of the allegations within the affidavit would not support probable cause.

_____

[2]  Although Defendant originally sought to suppress wiretapped conversations from a second telephone, Defendant agreed that the matter was moot when the Government announced that it was not going to use any evidence from the conversations at trial. Docket Entry [163], p. 2.

26

I.    **FACTUAL BACKGROUND**

A.    **Agent Badolato Obtains A Warrant For A Wiretap Of Marlon Burton's Telephone Calls**

On November 25, 2008, an Assistant United States Attorney applied for a wiretap for the interception of a Sprint-Nextel Communications cellular telephone used by Marlon Burton. (Gov't's Ex. 8). According to the application, Burton was suspected of distribution of and possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(2), conspiracy and attempt to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846, importation of and conspiracy to import controlled substances in violation of 21 U.S.C. §§ 952, 960, 963, money laundering and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956, 1957, use of a telephone to commit the commission of a Title 21 felony in violation of 21 U.S.C. § 843(b), and aiding and abetting the aforementioned crimes in violation of 18 U.S.C. § 2. To supply probable cause for the warrant, FBI Special Agent Nikki Badolato ("SA Badolato"), who was assigned to the OCDETF Strike Force (a drug crimes task force), swore to an affidavit. (Transcript of the Dec. 17, 2010, Evidentiary Hearing, hereinafter "Tr2." 8; Gov't's Ex. 8). SA Badolato began assisting the Brownsville, Texas office with investigating Burton as of July 2008. (Tr2. 8, 10; Gov't's

Ex. 8).   In the affidavit, SA Badolato relied upon information gained during the investigation as well as information provided by an unidentified cooperating witness ("CW1"), a second cooperating witness now identified as Leon Lumsden ("Lumsden" or "CW2"), and an undercover agent.  (Gov't Ex. 8; Tr2. 10).  Paragraph 31 of the affidavit discusses information obtained from Lumsden concerning Burton's drug distribution operations.  (Tr2. 35-36; Badolato Aff. ¶ 31).

### B.   Lumsden's Credibility is Questioned

On or around March 14, 2008, the FBI received a letter from Lumsden discussing the Marlon Burton organization.  (Tr2. 11-12; Gov't Ex. 2).  Lumsden had been convicted of mortgage fraud and had sought to cooperate with the FBI in exchange for a reduction in his sentence.  (Tr2. 19-20, 65).  SA Badolato and SA Campbell interviewed Lumsden on October 1, 2008. (Tr2. 22-23).  At the first interview, Lumsden was not expecting to discuss Burton, seemed unprepared, and wanted a chance to refer to his notes which he did not bring with him, but gave general information about Burton. (Tr2. 23).  The agents interviewed Lumsden again on October 8, 2008, and this time he was more informed and provided more specific information, including his handwritten notes. (Tr2. 23-24).  Lumsden told the agents that he had received the information from a girlfriend.  (Tr2. 26, 63, 74).  Lumsden informed the agents that for years, Burton had

28

been running an organized, structured drug distribution organization with numerous individuals working for him; Burton had received significant amounts of cocaine and marijuana on a regular basis directly from Mexican Cartel contacts; and law enforcement and political contacts had helped him remain undetected by law enforcement. (Badolato Aff. ¶ 31). Lumsden also informed the agents about Burton's process for distributing drugs and laundering money. (Badolato Aff. ¶ 31). The agents confirmed portions of the account Lumsden had provided by comparing it to public information available on databases. (Tr2. 25-26).

Unbeknownst to SA Badolato, around August 26, 2008, Mile Brosas, an agent on the FBI Public Corruption Civil Rights Squad, began investigating Lumsden on the suspicion that Lumsden had purchased information from another inmate at the Atlanta City Detention Center, Marcus Watkins, who in turn obtained the information from his cousin. (Tr2. 39-43, 86, 88, 108-11, 126-28). Lumsden purchased the information so that he could proffer it to law enforcement authorities in the hope that his cooperation could result in a reduction of his sentence. (Tr2. 117-18). As part of the investigation, Agent Brosas met with several Assistant United States Attorneys ("AUSAs") about the matter. (Tr2. 113; Transcript of Jan. 6, 2011, Evidentiary Hearing, hereinafter "Tr3.," 9; Def.'s Ex. 11). In September 2008, Watkins sent a letter to Bureau of Alcohol,

Tobacco, and Firearms ("ATF") Agent Peter Beck notifying him that Lumsden was purchasing information from his cousin to obtain a sentence reduction and that Lumsden was accusing Agent Beck and an AUSA of covering up a murder.  (Tr2. 6-9; Gov't's Ex. 10).  Thereafter, emails about Lumsden's diminished credibility circulated amongst some of the attorneys who did not prosecute drug crimes and some agents from the ATF.  (Tr2. 8-10, 27).  The emails, however, were not circulated to SA Badolato.  (Tr2. 43-44; Tr3. 22-23, 27; Gov't's Ex. 11).

## II.   **LEGAL ANALYSIS**

Defendant contends that there was no probable cause to intercept Burton's telephone calls because SA Badolato included falsehoods within her affidavit. Specifically, Defendant argues that the affidavit (1) falsely indicated that Lumsden's information was based on his first hand knowledge when it was actually purchased third hand knowledge; (2) included information supplied by Lumsden in reckless disregard of the truth because SA Badolato did not discuss Lumsden's credibility with other Assistant United States Attorneys and agents who had learned that Lumsden's credibility was suspect; (3) omitted to discuss Lumsden's crimes of dishonesty or Lumsden's efforts to persuade guards to smuggle drugs into the Atlanta City Detention Center; and (4) omitted to discuss other Assistant United States Attorneys' assessment of Lumsden's

30

credibility.  Defendant also contends that once the agent's alleged falsehoods are excised, no probable cause remains for the wiretap.  In support, Defendant contends that the information provided by CW1 was stale and that CW1 and the undercover agents' allegations, at most, only supported the notion that Burton was trying to get back into the cocaine trafficking business.

In Franks v. Delaware, 438 U.S. 154, 171 (1978), the Supreme Court held that a search warrant may be void under the Fourth Amendment if the affidavit supporting the search warrant contains deliberate falsity or reckless disregard for the truth.  Id.; Madiwale v. Savaiko, 117 F.3d 1321, 1326 (11th Cir. 1997).  A warrant affidavit may also violate the Fourth Amendment when it contains omissions made intentionally or with a reckless disregard of the truth.  Madiwale, 117 F.3d at 1327.  Omissions that are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate a warrant. Madiwale, 117 F.3d at 1327.  Defendant, however, is only entitled to relief if he can also show that absent the misrepresentations or omissions, probable cause would have been lacking.  United States v. Novation, 271 F.3d 968, 987 (11th Cir. 2001).  Thus, when material that is the subject of the alleged falsity or reckless disregard is set to one side and there remains sufficient content in the warrant affidavit to support a finding of probable cause, the warrant is valid.  Madiwale, 117 F.3d at 1326-27.

31

Additionally, where unsavory information relating to the background of an informant was omitted from an affidavit, the warrant is still valid if the statements are observed first hand and there is independent corroboration of the information within the statements. Madiwale, 117 F.3d at 1327.

In this case, even if the information provided by Lumsden was excised from the affidavit, the remainder of the allegations in the affidavit would still provide probable cause for the wiretap.  An application for a wiretap must be supported by the same probable cause necessary for a search warrant.  United States v. Nixon, 918 F.2d 895, 900 (11th Cir.1990).  Thus, the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability of finding evidence of a crime. Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999); United States v. Miller, 24 F.3d 1357, 1361 (1994); Nixon, 918 F.2d at 900.  "[P]robable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Gates, 462 U.S. at 241; Miller, 24 F.3d at 1361. "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be

32

employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." <u>Gates</u>, 462 U.S. at 241; <u>Miller</u>, 24 F.3d at 1361.

In this case, the remaining allegations of the affidavit independently show that there was a fair probability of finding evidence of a crime. SA Badolato stated in her affidavit that she suspected Burton of, among other things, distribution of and possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(2), conspiracy and attempt to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846, importation of and conspiracy to import controlled substances in violation of 21 U.S.C. §§ 952, 960, 963. The investigation by the FBI, consensually recorded telephone calls, as well as the statements of CW1 and the undercover agent provided probable cause that intercepted telephone calls from TT1 would provide evidence of these crimes. Other allegations within the affidavit indicated that not only was Burton establishing a new line of cocaine business, but also that he was already operating an ongoing, established business. SA Badolato attested that the FBI's investigation revealed that Burton's organization has been a regular source of cocaine supply coming into the United States and that Burton has significant connections to Mexican sources of supply. (Badolato Aff. ¶ 17). Badolato attested that she learned

33

from the investigation that Burton's main supplier is Duron. (Badolato Aff. ¶ 17). Duron is highly placed in the Gulf Cartel and is connected to the Los Zetas, which are both violent drug organizations out of Mexico. (Badolato Aff. ¶ 17). SA Badolato further attested that Duron recently supplied Burton with 100 kilograms of cocaine, and Burton paid Duron the balance due within three days of receipt. (Badolato Aff. ¶ 17). According to Badolato, CW1, who formerly supplied Burton with narcotics in 2003 contacted Burton via telephone and represented that he/she is a highly-placed member of the drug cartel, and inquired whether Burton could establish and manage a new narcotics line in Atlanta. (Badolato Aff. ¶ 18; Tr. 51). In July 2008, CW1 subsequently met in person with Burton as well as an undercover FBI agent and discussed a previous debt of $130,000 Burton owed to the cartel. (Badolato Aff. ¶ 19). During the meeting, Burton also discussed the fluctuating prices for cocaine in the Atlanta market, noted that the current cocaine product in Atlanta was "weak," agreed to pay $21,000 per kilogram for cocaine until his debt was repaid, explained his plans for his base of operation, and explained how he planned to stash the cocaine. (Badolato Aff. ¶ 20). In July 2008, Burton agreed, during consensually recorded telephone conversations with the undercover agent, to show the undercover agent his set up for the narcotics operation and told the undercover agent that he was ready to get started with the narcotics operation.

34

(Badolato Aff. ¶ 23).  Burton also informed the undercover agent that his contact with the drug cartel indicated that Duron may be concerned that he was being cut out and explained to the undercover agent that they should keep their business between them quiet.  (Badolato Aff. ¶ 25).

Additionally, this ongoing criminal activity was directly connected to the target telephone.  SA Badolato affirmed in her affidavit that she is familiar with the manner in which drug traffickers utilize cellular telephones and paging devices to conduct their transactions and that drug trafficking is often furthered by using multiple cellular telephones to avoid law enforcement detection.  (Badolato Aff. ¶ 3).  On October 1, 2008, a telephone call between CW1 and Burton occurred on TT1 and was recorded.  This time, Burton advised CW1 that he was ready to distribute drugs, that the organization had been set up, and that there had been no law enforcement activity.  (Badolato Aff. ¶ 32).  Toll records have revealed that TT1 has been used to contact Duron as well as Joe Sanroman, who, in early 2008, participated in the transportation and delivery of seventy-five kilograms of cocaine.  (Badolato Aff. ¶¶ 34-35).  Under these circumstances, there is ample probable cause that evidence of a crime would be recorded from TT1 even without relying on the information supplied by Lumsden.  See, e.g., Nixon, 918 F.2d at 901 (probable cause justified wiretap extension where telephone was

used to direct customers to another location for drug sales).

Defendant argues that this remaining evidence is not reliable because the information from CW1 was stale given that the last drug deal between Burton and CW1 occurred in 2003.  The probable cause needed to obtain a wiretap must exist at the time surveillance is authorized.  United States v. Harrington, 204 F. App'x 784, 786 (11th Cir. 2006) (citing United States v. Domme, 753 F.2d 950, 953 (11th Cir.1985)).  Information must be timely for probable cause to exist.  United States v. Green, 40 F.3d 1167, 1172 (11th Cir. 1994).  Stale information is not fatal, however, where the government's affidavit "updates, substantiates, or corroborates the stale material."  Green, 40 F.3d at 1172.  Moreover, the basic criterion as to the duration of probable cause is the inherent nature of the crime.  United States v. Magluta, 198 F.3d 1265, 1272 (11th Cir. 1999), an unrelated portion of the opinion was vacated on other grounds, 203 F.3d 1304 (11th Cir. 2000).  Where, as here, Burton was being investigated for drug trafficking activities, which are activities the Eleventh Circuit has previously noted to be inherently protracted and continuous, the specific dates within the affidavit indicating Burton's participation in illegal activity is not as important.  Magluta, 198 F.3d at 1272.    T    h    e aforementioned evidence is not stale.  Rather, it indicates past protracted and continuous drug trafficking activity as well recent drug trafficking activity between CW1 and Burton

just before the application for the wiretap.  Indeed, during the July 2008 meeting between CW1 and Burton during which Burton agreed to pay $21,000 per kilogram for cocaine until his debt was repaid, explained his plans for his base of operation, and explained how he planned to stash the cocaine.  (Badolato Aff. ¶ 20).  Furthermore, during the October 1, 2008, telephone call CW1 and Burton discussed Burton's readiness to distribute drugs and that his drug-trafficking organization had been set up to handle the additional supply of cocaine.  (Badolato Aff. ¶ 32).  In addition,  the undercover agent supplied evidence from a July 2008 phone call tending to show that Burton already was purchasing cocaine from Duron when he began his attempted business with CW1 because Burton surmised that Duron might be feeling that he was being cut out of Burton's business.  (Badolato Aff. ¶ 25).  Because the remaining allegations within SA Badolato's affidavit establish probable cause that evidence of a crime would be intercepted from TT1, Defendant's motion should be **DENIED**.  Docket Entry [130].

### CONCLUSION

For the foregoing reasons, this Court **RECOMMENDS** that Defendant's Motion to Suppress Statements and Defendant's Motion to Suppress all Conversation and Evidence Seized Pursuant to Court Ordered Electronic Interceptions be **DENIED**. Docket Entries [81, 130].  There are no further motions or problems pending before the

37

undersigned to prevent the scheduling of this case for trial.  Therefore, this action is

**CERTIFIED READY FOR TRIAL**.

      **SO  ORDERED AND REPORTED AND RECOMMENDED** this <u>4th</u> day of

May, 2011.

                  <u>/S/LINDA T. WALKER</u>
                  LINDA T. WALKER
                  UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA     )
          )
v.          )     Criminal Action No.
          )     1:09-CR-00482-TWT-LTW
IVEY GRANT     )
_____ )

## **ORDER FOR SERVICE OF REPORT AND RECOMMENDATION**

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636 and this Court's Local Rule 72.1C. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation **within fourteen (14) days of the receipt of this Order**. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the district court. **Failure to object to this Report and**

**Recommendation waives a party's right to appellate review**.  Fed. R. Crim. P. 59(b)(2).

The Clerk is directed to submit the report and recommendation with objections, if any, to the district court after expiration of the above time period.

**SO ORDERED**, this 4<u>th</u> day of May, 2011.


/S/LINDA T. WALKER
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE